UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK J. LYNCH, as President of the
PATROLMEN'S BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC. and the PATROLMEN'S BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC.,

                    Plaintiffs,

           v.

The CITY OF NEW YORK, the NEW YORK
CITY POLICE DEPARTMENT, and
RAYMOND W. KELLY, as COMMISSIONER
of the NEW YORK CITY POLICE
DEPARTMENT,

                    Defendants.

07 CIV 9337 (GBD)

ECF

**COMPLAINT**

Plaintiffs allege as follows:

## INTRODUCTION

1.    This is a civil action for declaratory judgment and injunctive relief brought to declare the rights and legal relations of the parties and to stop the enforcement of Interim Order, Reference P.G. 212, Series No. 52, with the subject "Alcohol Testing for Uniformed Members of the Service Involved in Firearms Discharges Resulting in Injury to or Death of a Person" ("the Interim Order"). A copy of the Interim Order is attached to the Declaration of David M. Nicholson as Exhibit A.

2.      Plaintiffs seek resolution of a single legal question: whether enforcement of the Interim Order violates the right of New York City police officers under the Fourth Amendment of the Constitution of the United States to be free of unreasonable government searches.

      a.      The Interim Order, issued September 30, 2007, requires all uniformed police officers "involved in a firearms discharge" in New York City to submit to a mandatory alcohol test.

      b.      Under the Interim Order, involved officers not in need of immediate hospitalization must remain at the scene of a firearms discharge under the supervision of a duty captain or inspector until an Internal Affairs Bureau ("IAB") officer arrives. The IAB officer will conduct an alcohol test using a Portable Breathalyzer Test ("PBT") device on any uniformed police officer who discharged a firearm. The subject officer also may be tested using an Intoxilyzer device.

      c.      Involved officers must be tested whether or not there exists any reason to suspect the officers have consumed any alcohol.

3.      Plaintiffs request that the Court declare the Interim Order unconstitutional because its enforcement will violate the right of New York City police officers to be free of unreasonable government searches and seizures.

4.      For the same reason, Plaintiffs request that the Court permanently enjoin Defendants from enforcing the Interim Order.

5.      Plaintiffs request that the Court, under 28 U.S.C. § 2202, grant any further declaratory and injunctive relief that may be necessary or proper.

2

## JURISDICTION & VENUE

6.    This Court has subject matter jurisdiction over all federal claims under 28 U.S.C. § 1331 and personal jurisdiction over all defendants. The Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a).

7.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and by the general legal and equitable powers of this Court.

8.    Venue is appropriate under 28 U.S.C. § 1391(e).

## PARTIES

9.    Plaintiff Patrick J. Lynch is the President of the Patrolmen's Benevolent Association of the City of New York, Inc.

10.    Plaintiff Patrolmen's Benevolent Association of the City of New York, Inc. ("PBA"), is a municipal employee organization duly formed under the New York City Administrative Code. Its members consist of all police officers employed by the New York City Police Department except those designated as First, Second, and Third Grade Detectives.

   a.    The PBA sues on its own behalf and on behalf of its members and board of directors.

   b.    The PBA has nearly 50,000 active and retired members.

   c.    The PBA regularly engages in collective bargaining with the City of New York over questions relating to the rights of New York City police officers.

11.    Defendant the City of New York ("the City") is a municipal corporation

3

organized and existing pursuant to the laws of the State of New York and is a public employer under the New York City Administrative Code.

12.    Defendant New York City Police Department is a department within the City created by the New York City Charter and a municipal agency duly formed under the New York City Administrative Code.

13.    Defendant Raymond W. Kelly is the Commissioner of the New York City Police Department with responsibility for the operation of the department.

## BACKGROUND

### A.    The Sean Bell Shooting and the Police Department Response

14.    In the early morning of November 25, 2006, Sean Bell, an African American, was shot dead by a group of five New York City police officers as he and two others attempted to flee a topless bar in Queens. According to the officers, Bell's car struck an unmarked police van, and nearly struck an approaching detective. In total, the officers fired fifty bullets at or into Bell's car. After the shooting the officers discovered that Bell and his companions were unarmed.

15.    The public outcry was swift and vociferous. Within days, community leaders including the Reverend Al Sharpton made statements condemning the shooting, asking that the officers involved be suspended, and calling for justice.

16.    On November 27, 2006, a group of religious leaders and elected officials met with Commissioner Kelly and New York Mayor Michael R. Bloomberg at City Hall. According to Sharpton, during that meeting, the demand that officers have their sobriety tested after shootings was a "rallying cry."

17.    On January 4, 2007, Commissioner Kelly announced that the RAND

4

Corporation, a nonprofit institution that specializes in research and analysis, would undertake a comprehensive assessment of the Police Department's firearms training and firearms discharge review process. Although the review was prompted by the Bell shooting, RAND would not look into Bell's death, which was then under review by a grand jury. Rather, the RAND investigation was to look at the perceived problems that lay behind the Bell shooting, namely the firearms training provided to new recruits; in-service firearms training and the annual qualification training for every officer; tactical firearms training; the functions and processes of the Firearms Discharge Review Board; and the phenomenon of reflexive shooting, its prevalence, and the effectiveness of methods to control it. RAND was not asked to investigate the relationship between alcohol use and the discharge of police firearms or whether there was a problem with alcohol consumption among New York's police officers.

18.    Plaintiffs do not know whether RAND has issued a report of its findings or given any recommendations to the Police Department.

19.    On January 24, 2007, New York's City Council questioned Commissioner Kelly for more than three hours in a hearing about the Police Department's training of specialized and undercover officers. During the questioning, Councilman Charles Barron called for Commissioner Kelly's resignation over the Bell shooting. The questioning focused on diversity in the Police Department, standards for undercover operations, and perceptions of the police's unequal treatment of black New Yorkers, not on the relationship, if any, between officer alcohol consumption and the discharge of firearms.

20.    On March 16, 2007, a grand jury indicted three of the five police officers involved in the Bell shooting for crimes including manslaughter, reckless endangerment,

and assault. The other two were not indicted. All three indicted officers pleaded not guilty.

21.    In late May 2007, CBS2 HD, a news organization, published a copy of the Police Department's 2005 Firearms Discharge Report. According to the 2005 report, of the 237 "incidents" between 2004 and 2005, only 10 (about 4.2 percent) were "Unauthorized (Intoxicated/Domestic)," and of those, it is unclear how many involved intoxicated officers. The report also does not indicate whether any of the unauthorized incidents resulted in injury or death.

22.    Plaintiffs have obtained a copy of the Police Department's 2002 Firearms Discharge Report as well. The 2002 report defines an "incident" as "Any incident during which a [Uniformed Member of the Service] fired their weapon for any reason." According to the 2002 report, there were 119 incidents in 2002. None of these were attributed to "Intoxicated, Domestic, etc."

23.    The information contained in the 2002 and 2005 Firearms Discharge reports is consistent with the records kept by Stuart London, a partner in the law firm of Worth, Longworth and London, LLP and counsel to PBA members. London's records indicate that, since May of 1998, his firm has received notification of 576 shootings by police officers within New York city limits. Of those, 538 involved on-duty matters and 38 involved off-duty matters. Every officer involved in an on-duty shooting was found fit for duty, which means, among other things, that the involved officer was not intoxicated or otherwise impaired. In only three of the thirty-eight off-duty incidents, officers were found unfit for duty. In those three events, no civilians were injured. In

one shooting, the off-duty officer sustained a self-inflicted graze wound to the head, and in both other situations, the officers shot into the air, causing no injuries.

**B.    The Interim Order**

24.    On June 18, 2007, Commissioner Kelly issued a press release containing nineteen recommendations made by the Committee for the Review of Undercover Procedures ("the Committee"), a panel he appointed to review Police Department undercover procedures in the wake of the Bell shooting. Chief of Internal Affairs Charles Campisi chaired the Committee, which comprised primarily members of the Police Department and the New York State Division of Criminal Justice Services.

25.    The Police Department's press release quoted Commissioner Kelly as saying that the Committee's work "has resulted in a comprehensive set of thoughtful recommendations to make police undercover operations safer, more effective, and better understood by the public."

26.    Fifteen of the Committee's nineteen recommendations dealt expressly with undercover officers. Of the remaining four, only two were not obviously related to undercover or plainclothes operations. One recommendation suggested requiring each police bureau's investigations unit to inspect tactical meetings to assess their adequacy and completeness. The other recommended that the Police Department "[r]equire the administration of a Breathalyzer test in all cases in which a member of the service is involved in a firearms discharge incident, on duty or off duty, which results in injury or death." The recommendation was not limited to the testing of undercover officers.

27.    According to the press release, Commissioner Kelly notified the Police Department's executive command staff of the recommendations on June 18 and "directed

them to devise implementation plans or to identify any challenges or barriers to implementation." The recommendation related to alcohol testing was singled out. The press release stated that the alcohol testing would begin as early as September.

28.     According to the New York Times, on the day of the press release, Commissioner Kelly "reiterated that there is no 'indication or evidence' that alcohol played a role in the Bell shooting. He said the five officers 'were found to be fit for duty.'"

29.     The press release did not disclose the nature of the Committee's research or reveal its findings. As far as Plaintiffs are aware, that information—in particular, any findings, if they exist, linking firearms discharges by police officers to alcohol—has never been disclosed.

30.     On September 30, 2007, at the direction of Commissioner Kelly, the Police Department issued the Interim Order "[t]o ensure the highest levels of integrity at the scene of police involved firearms discharges which result in injury to or death of a person, on or off duty, within New York City." The Interim Order requires the mandatory alcohol testing of uniformed—not undercover—police officers who discharge their weapons. The Interim Order sets forth the following procedures:

     a.     When a uniformed New York City police officer is involved in or responds to a firearms discharge that results in injury or death to a person, the Interim Order directs him or her to comply with the provisions of Procedure No. 212-29, discussed below in ¶¶ 35–37. In addition, the officer should notify, among others, the IAB. A non-involved police officer should inform any involved officer that he or she will be subject to an alcohol test and remain with

8

the involved officer until an IAB representative arrives to administer the test.

b.    The IAB duty captain who arrives should advise the involved officer that he or she may be tested for alcohol by a number of different means, including the PBT and the Intoxilyzer. The IAB captain should then conduct an alcohol test using the PBT in a private setting.

c.    If the PBT reading is less than 0.8, no further testing is required "at [that] time." But if it is greater than 0.8—which, the Interim Order points out, is indicative of intoxication according to Section 1192 of the Vehicle and Traffic Law of the State of New York—the IAB captain must immediately call Highway I.D.T.U. to test the involved officer using the Intoxilyzer. An involved officer who does not need to be hospitalized will be taken to an IAB testing facility or I.D.T.U. facility by IAB personnel for Intoxilyzer testing to be conducted by an I.D.T.U. technician.

d.    A Highway District supervisor must be present during all phases of the testing procedure. The entire Intoxilyzer testing process, including the reading of the test results, must be videotaped by a member of the Highway District. In cases in which the Intoxilyzer returns a reading of 0.8 or greater, the tape must be safeguarded "for evidentiary purposes."

## C.    Other Police Regulations Relating to Firearm Discharges or Alcohol Consumption and Intoxication

31.    Before the Interim Order was issued, the Police Department already had in place numerous policies pertaining to the handling of firearms discharges by police officers and the testing of officers for alcohol or drug use and intoxication.

32.    Police Department Procedure No. 206-12, entitled "Removal of Firearms

9

From Intoxicated Member of the Service," has as its purpose the determination of whether a police officer is unfit for duty due to intoxication. Procedure No. 206-12 instructs supervising officers to use common sense standards to determine whether an officer is unfit for duty. The commanding officer or duty captain should examine the totality of the circumstances and consider all credible, relevant information, including any Supervisor's Fitness for Duty Reports prepared, witness statements, and available scientific evidence. When a commanding officer or duty captain determines that a police officer is intoxicated, the intoxicated officer's firearm is removed in accordance with the guidelines given in Procedure No. 206-17. The supervisory officer must then contact the Counseling Services Unit so that the unit can determine whether counseling is necessary or appropriate.

33.    Prior to a final adjudication of misconduct cases involving the use of alcohol, the Counseling Services Unit must conduct an alcoholism assessment on the offending officer. In some cases, final adjudication of the disciplinary proceeding will be held in abeyance until the officer being investigated completes a treatment for alcoholism.

34.    The Fitness for Duty regulation, Procedure No. 203-04, states that a police officer's misuse of a firearm while unfit for duty due to intoxication from alcohol will result in the officer's termination from the Police Department.

35.    Police Department Patrol Guide Procedure No. 212-29 sets forth the regulations for investigating firearms discharges by uniformed members of the service. After a police officer discharges a firearm, the officer should request a patrol supervisor; call for an ambulance and render assistance, if necessary; and safeguard the scene. The

10

patrol supervisor should notify the desk officer, who in turn ensures that the precinct commanding (or executive) officer, the Operations Unit, and the patrol borough command are all notified of the incident promptly. If an injury is involved, the IAB Command Center is also notified. The Operations Unit then notifies the duty chief, and the patrol borough command notifies a duty inspector and investigating officer (a duty captain or shooting team leader, for example).

36. The investigating officer notifies the District Attorney's office in all shooting cases, regardless of whether there was injury, and confers with the District Attorney before interviewing the involved officers. The investigating officer then conducts interviews and inspects firearms for evidence of recent discharge. A discharged weapon is removed from the involved officer and sent to the Firearms Analysis Section under the supervision of an officer assigned to the Borough Investigations Unit. Finally, the investigating officer directs the involved officer to prepare a Firearms Discharge/Assault Report, following the regulations found in Procedure No. 424-151.

37. Within ninety days of the firearms discharge, the commanding officer prepares a final report. The final report is reviewed by the Borough Firearms Discharge Advisory Board, which may sustain or alter the findings in the final report and the recommendations previously made. This Board then prepares its own report for review by the Department Firearms Advisory Board.

38. In addition to these safeguards, the Police Department has had in place since May 2006 a requirement that uniformed police officers be randomly screened for drug use. Furthermore, whenever any member of the service suspects that another (uniformed or civilian) may illegally be using drugs or controlled substances, a

11

supervising officer determines if reasonable suspicion of illegal activity has been established, and if it has, arranges for a drug screening test.

39.     Another regulation, also in place since May 2006, obligates all officers wishing to obtain a civil service promotion to submit to a drug screening test. A civil service promotion is a promotion that is received as a result of a competitive civil service examination and includes promotion to the ranks of Sergeant, Lieutenant, and Captain. A drug screening test is also required of uniformed officers as a condition of discretionary promotion.

40.     Finally, the Police Department also has in place regulations regarding the administration of voluntary drug testing to detect illegal drug and controlled substance abuse. This testing is made available to officers who wish to dispel unsubstantiated allegations of illegal drug or controlled substance abuse when the reasonable suspicion standard has not been met.

### D.    The Implementation of the Interim Order

41.     Since the issuance of the Interim Order, there have been two incidents involving the discharge of police firearms. Four officers have been tested without reasonable suspicion of intoxication in connection with these incidents; none was intoxicated.

42.     On October 3, 2007, three uniformed police officers attempted to arrest a man suspected of a double shooting. When confronted by the officers, the suspect fired at them six times with a semiautomatic pistol. The officers discharged their weapons in self defense, firing thirteen times in total. The suspect and two of the officers were shot in the exchange. All three officers were taken to the hospital, where they were observed

and not allowed to drink anything until an alcohol test had been administered. The suspect was indicted for thirteen felonies, including three counts of attempted murder of a police officer.

43.     Three days later, on October 6, 2007, an off-duty police officer walked out of a diner in which he had been eating breakfast with his girlfriend to see a man stabbing a sixty-seven year old woman on the street. The man, who minutes before had slashed another man in the neck, did not obey the officer's commands to stop. Instead, he advanced on the officer, wielding a long knife in each hand. When the man was approximately three feet from the officer, the officer fired a single shot, wounding the man in the lower left abdomen. The officer, who was taken to a hospital to be treated for trauma, was tested for alcohol intoxication using a PBT device. It was determined that he was not intoxicated.

## COUNT I

### Declaratory Judgment
### (28 U.S.C.§§ 2201 and 2202)

44.     Plaintiffs hereby reallege and incorporate each of the foregoing allegations as if set forth fully herein.

45.     An alcohol test administered by a member of the Police Department (or at the direction of a member), including any test conducted using a PBT or Intoxilyzer, constitutes a search or seizure under the Fourth Amendment of the Constitution of the United States and Article 1, Section 12 of the Constitution of the State of New York.

46.     Enforcement of the Interim Order's requirement that all police officers be tested for intoxication after every discharge of a firearm resulting in injury to or death of

13

a person will result (and has resulted) in the suspicionless search of members of the New York City Police Department.

47.    Such searches are performed primarily for a general law enforcement purpose and impermissibly encroach upon the police officers' right to be free of unreasonable searches.

48.    Regulations already in place before the issuance of the Interim Order satisfactorily monitored the fitness and sobriety of police officers.

49.    Defendants have offered no evidence of alcohol abuse among police officers to support a policy of suspicionless testing after shooting incidents resulting in injury or death.   Statistics available to Plaintiffs do not support the proposition that alcohol is a factor in a significant number of shootings involving police officers.

50.    The Interim Order does not appear to have been issued on the basis of any evidence or findings that alcohol abuse was a factor in a significant number of police shootings resulting in injury or death.

51.    Any incremental safety benefit that does result from the enforcement of the Interim Order does not outweigh the concomitant intrusion upon the police officers' privacy and insult to their dignity.

## COUNT II

### Injunctive Relief

52.    Plaintiffs hereby reallege and incorporate each of the foregoing allegations as if set forth fully herein.

14

53.    For the reasons set out in ¶¶ 44–51, the enforcement of the Interim Order will result (and has resulted) in the violation of New York City police officers' right to be free of unreasonable government searches and seizures.

54.    The violation of this fundamental right constitutes an irreparable injury.

55.    These injuries will not cease unless the Court permanently enjoins Defendants from enforcing the Interim Order.

WHEREFORE, Plaintiffs Patrick J. Lynch and the Patrolmen's Benevolent Association of the Police Department of the City of New York pray for judgment against defendants the City of New York, the New York City Police Department, and Raymond W. Kelly, as Commissioner of the New York City Police Department, as follows:

(a)    a declaratory judgment that the Interim Order violates New York City police officers' Fourth Amendment right to be free of unreasonable government searches and seizures;

(b)    an order permanently enjoining Defendants from enforcing the Interim Order; and

(c)    whatever other relief is necessary and proper.

Respectfully submitted,

LAW OFFICES OF THOMAS P. PUCCIO

By: _Thos P. Puccio_

OF COUNSEL:

Michael T. Murray
Office of the General Counsel of
the Patrolmen's Benevolent
Association of the City
of New York
40 Fulton St.
New York, New York 10038-1850
Telephone: (212) 775-4500

Thomas P. Puccio
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP

Lawrence S. Robbins (LR-8917)
Donald J. Russell
Alison C. Barnes
Brian A. Pérez-Daple
1801 K Street, N.W.
Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Plaintiffs*

Dated: October 18, 2007