LAW OFFICES OF THOMAS P. PUCCIO
230 PARK AVENUE
SUITE 301
NEW YORK, N.Y. 10169

TEL: 212-883-6383
FAX: 212-883-6388
E-MAIL: tpuccio@lotpp.com

October 22, 2007

Hon. George B. Daniels
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 630
New York, NY 10007

Re:   Patrick J. Lynch, et al., v. City of New York, et al.
      United States District Court, Southern District of New York
      Case No. 07 Civ. 9337

Dear Judge Daniels:

This letter responds to the letter sent by Assistant Corporation Counsel Alan Schlesinger at the close of business on October 19, 2007, regarding Plaintiffs' request for an immediate hearing on their application for a temporary restraining order to suspend enforcement of Police Department Interim Order 52, which requires the administration of sobriety tests to police officers involved in shootings that result in injury or death. Defendants contend that an immediate hearing is unnecessary because there is no urgent need to afford Plaintiffs relief from the Interim Order and Plaintiffs are unlikely to prevail on the merits. Defendants are wrong on both counts.

1.   The Need for Immediate Relief

As we explain in the papers we filed on October 18, Plaintiffs need an immediate remedy – in the form of a temporary restraining order – to prevent police officers from being deprived of their Fourth Amendment rights. In the three weeks since the Interim Order went into effect, at least five officers have been forced to submit to alcohol testing in the immediate aftermath of shootings. The frequency with which the testing is occurring coupled with the gravity of the constitutional violations alleged make the need for immediate relief clear. At a minimum, Plaintiffs are entitled to a decision on their application for a temporary restraining order prior to any more officers being subjected to the required testing. Delaying the decision until after a hearing on November 20 will undoubtedly allow many more potential constitutional violations to occur. See Nicholson Decl. ¶ 6.

Contrary to Defendants' suggestion, the timing of Plaintiffs' application does not foreclose the granting of the requested relief. Plaintiffs filed their papers within weeks of the Interim Order becoming effective, during which time they gained an understanding of the scope of the program and how it is being implemented, researched relevant facts and

law, and prepared a submission to the Court. The Court should decline Defendants' invitation to measure the need for the requested relief by the timing of Plaintiffs' filing.

    2.    Likelihood of Success on the Merits

Mr. Schlesinger's October 19 letter previews the arguments Defendants will make to defend the Police Department's alcohol testing program but does little to refute the arguments set forth in Plaintiffs' Memorandum of Law that establish the high likelihood that Plaintiffs will succeed on the merits.

At the outset, it is important to note what is not in dispute. There appears to be a consensus that the alcohol testing administered to police officers is subject to the requirements of the Fourth Amendment because it is a government-sponsored search. In addition, the parties appear to agree that the threatened deprivation of a constitutional right constitutes irreparable injury. See Pl. Memo. at 2-3.

The parties disagree on whether the search is unreasonable under the Fourth Amendment. In their Memorandum of Law, Plaintiffs explain that the alcohol testing required by the Interim Order is constitutionally impermissible because it is administered without any individualized suspicion of wrongdoing and is not justified by a "special need" beyond the ordinary need for law enforcement. See Pl. Memo. at 3-8. Defendants concede that the testing is administered without individualized suspicion but contend that the testing is lawful nonetheless because the City has a special need for it.

What Defendants fail to acknowledge is that the Supreme Court has upheld suspicionless testing only if the asserted special need "was one divorced from the State's general interest in law enforcement." *Ferguson v. Charleston*, 532 U.S. 67, 79 (2001). The testing involved here is inseparable from the government's general law enforcement interest. It is triggered by an event that is under investigation by the Police Department, and the individual officer is tested specifically because of his or her involvement in that event. The testing is performed by or under the supervision of the Internal Affairs Bureau, an entity charged with investigating officer corruption and serious misconduct (which the Police Department Patrol Guide defines as criminal misconduct of any kind). The entire testing process is to be videotaped, thus ensuring the availability of evidence for future legal proceedings. There is no limitation on the use of the test results in criminal prosecutions. The test procedures were devised by, and will be implemented by, the Police Department, the government's principal law enforcement agency. See *Charleston*, 532 U.S. at 84 (fact that test results are turned over to police "does not merely provide a basis for distinguishing of prior cases applying the 'special needs' balancing approach. * * * It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment."). More troubling is the fact that the results of the testing are virtually certain to end up in the hands of a District Attorney's Office, which is required to respond to police shootings involving injury or death. See 10/19/07 Schlesinger Letter at 3 (acknowledging that shooting incidents result in "intensive investigations," including the possibility of involvement of a District Attorney's office). It is precisely in circumstances like these that individualized suspicion is required before a search may be conducted. See *Amerson*, 483 F.3d at 82.

Defendants do not reckon with the law enforcement implications of the Interim Order. Instead, they rely on *Skinner* v. *Railway Labor Executives' Association*, 489 U.S. 602, 616-617 (1989), and contend that the Interim Order is justified by special needs other than law enforcement (where individualized suspicion is not required). *Skinner* involved mandatory alcohol and drug testing of railroad crew members after major accidents occurred. The testing addressed a continuing and persistent problem of alcohol use on railroads, followed more than a century of efforts to address the problem, was devised by a federal agency responsible for railroad safety, and was undertaken in response to a large factual record documenting extensive on-the-job intoxication and accident investigation reports finding a large number of accidents in which alcohol or drug use was a probable cause or contributing factor. 489 U.S. at 606-07.

The origins of the testing program here are starkly different. The Police Department has made no finding that intoxication while on duty is a significant problem. It has not even suggested that the *possibility* of such a problem merits investigation. Nor has it made any finding that intoxication has contributed in any degree to shootings involving death or injury. The origin of the testing requirement here was *not* a demonstrated risk to public safety; rather, it was a political controversy arising from a shooting death. See 10/19/07 Schlesinger Letter at 3 (stating that the Interim Order arose from recommendations following the death of Sean Bell).[1]

What is more, to the extent that there is a special need to ensure the fitness of those who use firearms, that need is already served by an extensive regime of testing police officers. McCabe Decl. ¶¶ 2-8. New York City police officers are subject to drug testing as a prerequisite to their entry into the police force, as a prerequisite to certain appointments and promotions, and on a random basis. McCabe Decl. ¶¶ 2-8. As Defendants acknowledge, the police officers already were subject to numerous checks for fitness in the regular course of duty. See 10/19/07 Schlesinger Letter at 2 (describing the many regulations in place before the issuance of Interim Order 52, including "an entire regulation devoted to the removal of firearms from intoxicated officers"). The newly ordered tests are different. They are triggered by the *conduct* of an individual officer, not by the position he holds or seeks, and they are conducted as part of a police investigation of that conduct, not to assess an individual's fitness for a position voluntarily sought.

Even if the Interim Order serves a "special need," it is unreasonable. In cases where the Supreme Court has approved the use of suspicionless searches, it has required that they be conducted in furtherance of important government goals. Indeed, the greater the need for the particular policy, the more likely it is that an intrusion on privacy interests will be justified. The principle is illustrated by *Skinner*, where the Court held that promoting railway safety is an important federal objective, particularly given the long history of alcohol abuse in the industry and empirical information showing a link between on-the-job drinking and railway safety problems. 489 U.S. at 620. The

---

[1] Notably, in *Skinner*, the Court found no indication that test results were turned over to law enforcement authorities. *Id.* at 621 n.5. That program was devised to promote railroad safety, "not to assist in the prosecution of employees." *Id.* at 620. Here, as discussed above, the law enforcement purposes are apparent.

3

converse of the finding in *Skinner* is also true: If there is *not* a pressing need for a particular government policy, an invasion of an individual's privacy rights is constitutionally impermissible. *Chandler* v. *Miller*, 520 U.S. 305, 323 (1997). Similarly, if the government does identify a legitimate purpose, but the policy does not further it (or furthers it only incidentally), an invasion of an individual's constitutional rights is not allowed. See *Indianapolis* v. *Edmond*, 531 U.S. 32, 46 (2000) (noting that a legitimate secondary purpose for a suspicionless search cannot justify the procedure if the primary purpose is illegitimate).

With regard to the alcohol testing at issue here, the Police Department has failed to identify an important goal that the policy clearly advances. The Interim Order states only that alcohol testing helps to ensure "the highest level of integrity at the scene of firearms discharges." But that offers little insight into the reasons for the policy, the concerns that led to its adoption, or the direness of the City's need for it. The facts surrounding the institution of the policy suggest that it was imposed to defuse criticism over the highly publicized shooting death of a civilian and to ensure the availability of alcohol-related evidence in future police shooting cases, not to further an important governmental goal such as safety. See Complaint ¶¶ 14 - 30.

In their letter to the Court, Defendants contend that the alcohol testing policy serves numerous public purposes (which Defendants presume creates a special need for the intrusion on individual liberties): deterrence of alcohol influenced behavior, safety, protection of the integrity of the police force, and maintenance of the public's confidence. 10/19/07 Schlesinger Letter at 3. These *post hoc* justifications cannot save the day, as discussed below.

The Interim Order is not needed to further the goal of deterring alcohol use among uniformed officers. Numerous regulations in place before the issuance of the Interim Order satisfactorily ensured the fitness and sobriety of police officers. See 10/19/07 Schlesinger Letter at 2; McCabe Decl. ¶ 8; Nicholson Decl. ¶ 3; London Decl. ¶ 7. *See also* Complaint ¶¶ 31-40.[2] Those provisions, which include assessments of fitness for duty and punishments (including termination), already deter on-duty and excessive off-duty intoxication, as does police officers' concern for their own well-being. Any additional deterrence that might result from the issuance of the Interim Order will be marginal, and the decrease in risk of injury to the public similarly minimal.

Defendants' averment that safety concerns justify the Interim Order is unsubstantiated and incredible. The lack of a connection between the Interim Order and a safety-related goal is borne out by the fact that there are no studies or findings that support the conclusion that such a policy is needed. See Nicholson Decl. ¶ 4; McCabe Decl. ¶ 9. The absence of any such findings undermines the claim that the Interim Order effectively advances a safety interest (or even that it was issued with the promotion of

---

[2] Those regulations included a requirement that a Police Department superior officer make a fitness for duty determination at the scene of a shooting. London Decl. ¶ 5. That system worked well and obviated the need for invasive alcohol testing. *Id.* at ¶ 7; McCabe Decl. ¶ 8. The addition of the Interim Order adds nothing of value to the previous scheme. It does, however, differ from the previous system in one important respect – it requires the creation of a contemporaneous record that can be used against the officer in a subsequent proceeding. For that, a warrant is required, regardless of the need to administer the test soon after a shooting occurs.

4

safety as its primary purpose). See *Chandler*, 520 U.S. at 319 (overturning a suspicionless drug-testing requirement in part because "[n]othing in the record hints that the hazards respondents briefly describe are real and not simply hypothetical"). Indeed, Plaintiffs are aware of no information that would lead a reasonable person to conclude that alcohol-related shootings resulting in injury or death are a recurring problem within the Police Department such that there is an important need to address it. See London Decl. ¶ 6; Nicholson Decl. ¶ 4; McCabe Decl. ¶ 9. Defendants respond by saying "that the [Police Department] need not await positive proof of an alcohol related shooting to take positive steps to ensure that a future such tragedy is averted." See 10/19/07 Schlesinger Letter at 2. But even if evidence of alcohol-related shootings is not necessary to justify Interim Order 52, without any indication that New York City police officers *even have an alcohol problem*, there is simply no basis for finding that the Police Department has a special need for its new alcohol testing program akin to the safety-related reasons identified in *Skinner*.[3]

Defendants' third and fourth proffered justifications for the policy – protection of the integrity of the police force and maintenance of the public's confidence – cannot withstand scrutiny. Those justifications are another way of saying that the policy is symbolic: It is designed to assure the public that the Police Department operates with integrity where the use of firearms is concerned. In light of the Sean Bell incident, it is hardly surprising that public officials want to project an image of being tough on police officers' firearm use (even though there is no indication that the use of alcohol caused the Bell shooting), but that "need" is "symbolic, not 'special,'" within the meaning of *Skinner* and its progeny. *Chandler*, 520 U.S. at 322. Accordingly, those justifications are insufficient to allow an infringement on police officers' Fourth Amendment rights.

In sum, Plaintiffs are entitled to the temporary restraining order they have requested because they have shown that continued application of the Interim Order will result in irreparable injury in the form of further invasions of police officers' Fourth Amendment right to be free from unreasonable searches, and Plaintiffs are likely to prevail on the merits. Accordingly, we renew our request for an immediate hearing.

Respectfully submitted,

Thomas P. Puccio

Cc: Alan Schlesinger (*via* facsimile)

---

[3] In *Skinner*, there were at least two good reasons to suspect a link between employee impairment and railway disasters: (1) a train wreck usually does not occur without a mechanical malfunction and/or employee error or incompetence; and (2) there was a documented history of recent on-duty alcohol use. The opposite is true here. There is no obvious connection between a police officer's discharge of a firearm, whether or not injury occurs, and the likelihood of impairment due to alcohol. There is also no evidence to suggest that police officers are more likely to abuse alcohol, on or off the job, than people in other professions.

P 1

\* \* \* COMMUNICATION RESULT REPORT ( OCT 22 2007 2:46PM ) \* \* \*

FAX HEADER: ROBBINS RUSSELL

```
TRANSMITTED/STORED : OCT 22 2007  2:32PM
FILE MODE           OPTION               ADDRESS                                    RESULT      PAGE
-------------------------------------------------------------------------------------------------------
777  MEMORY TX                           G3  :*4613*16030705*912128056737*1  OK                 6/6
                                              6030705
```

```
REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL              E-2) BUSY
  E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
  E-5) MAIL SIZE OVER
```

## LAW OFFICES OF THOMAS P. PUCCIO
230 PARK AVENUE
SUITE 301
NEW YORK, N.Y. 10169

TEL: 212-883-6383
FAX: 212-883-6388
E-MAIL: tpuccio@lotpp.com

### TELECOPY/FACSIMILE COVERSHEET

Date: October 22, 2007                                   Time: _____

From: Thomas P. Puccio                                   Total Number of Pages: ____6____
                                                         (Including Cover)

TO:            Hon. George B. Daniels

COMPANY:       United States District Court

FAX NUMBER:    (212) 805-6737

PHONE NUMBER:

MESSAGE:       Please see attached letter.

The attached information is CONFIDENTIAL and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

```
                    ************************
                    ***    TX REPORT     ***
                    ************************

TRANSMISSION OK

TX/RX NO                  2860
RECIPIENT ADDRESS         12127880940
DESTINATION ID
ST. TIME                  10/22 13:41
TIME USE                  03'41
PAGES SENT                    6
RESULT                    OK
```

# LAW OFFICES OF THOMAS P. PUCCIO

230 PARK AVENUE
SUITE 301
NEW YORK, N.Y. 10169

61 Singing Oaks Drive
Weston, C.T. 06883
203-222-8669

TEL: 212-883-6383
FAX: 212-883-6388
E-MAIL: tpuccio@lotpp.com

## TELECOPY/FACSIMILE COVERSHEET

Date: October 22, 2007                          Time: _____

From: Thomas P. Puccio                          Total Number of Pages: _____6_____
                                                (Including Cover)

        TO:              Alan Schlesinger

        COMPANY:         Corporation Counsel of the City of New York

        FAX NUMBER:      212-788-0940