UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PATRICK J. LYNCH, as President of the PATROLMEN'S BENEVOLENT ASSOCIATION of the CITY OF NEW YORK, INC. and the PATROLMEN'S BENEVOLENT ASSOCIATION of the CITY OF NEW YORK, INC., <br><br>              Plaintiffs, <br><br>              v. <br><br>The CITY OF NEW YORK, the NEW YORK CITY POLICE DEPARTMENT, and RAYMOND W. KELLY, as COMMISSIONER of the NEW YORK CITY POLICE DEPARTMENT, <br><br>              Defendants. | 07 CIV 9337 (GBD) <br><br> ECF <br><br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………………...ii

INTRODUCTION…………………………………………………………………..…..1

ARGUMENT…………………………………………………………………..………....2

    A. Irreparable Injury...............................................................................................2

    B. Likelihood of Success on the Merits.........................................................................2

        1. There is no "special need" for the testing......................................................3

        2. Even if the testing serves a "special need," it is unreasonable....................8

CONCLUSION.......................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Chandler* v. *Miller*, 520 U.S. 305 (1997)........................................................................9, 10

*Covino* v. *Patrissi*, 967 F.2d 73 (2d Cir. 1992).....................................................................2

*Indianapolis* v. *Edmond*, 531 U.S. 32 (2000).................................................................3, 4, 9

*Ferguson* v. *Charleston*, 532 U.S. 67 (2001).........................................................................4

*McGraw-Hill* v. *Ingenium Tech. Corp.*, 364 F. Supp. 2d. 352 (S.D.N.Y. 2005)..................2

*Michigan Dept. of State Police* v. *Sitz*, 496 U.S. 444 (1990)..................................................4

*Mitchell* v. *Cuomo*, 748 F.2d 804 (2d Cir. 1986)...................................................................2

*Nat'l Treasury Employees Union* v. *von Raab*, 489 U.S. 656 (1989).....................5–6, 8, 10

*New York* v. *Burger*, 482 U.S. 691 (1987)............................................................................4

*Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989)..................3, 7, 8–9, 10

*United States* v. *Amerson*, 483 F.3d 73 (2d Cir. 2007)...............................................3, 5, 6, 8

*United States* v. *Lidster*, 540 U.S. 419 (2004)......................................................................5

*United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976).........................................................4

## CONSTITUTIONAL PROVISIONS AND STATUTES

Constitution of the United States, Amendment 4..................................................................2

Constitution of the State of New York, Article 1, Section 12................................................2

Plaintiffs submit this Memorandum of Law in support of their Application for a Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

This case has been brought by police officers in the City of New York to prevent a threatened violation of their constitutional rights. The Police Department has issued an Interim Order that requires all uniformed officers to undergo alcohol tests if they are involved in a shooting that results in death or injury. The testing is required even if there is not one iota of evidence that the officer's conduct in connection with the shooting was in any way improper, or that the officer had recently used or was under the influence of alcohol. The testing requirement was adopted even though, to Plaintiffs' knowledge, there is no evidence that alcohol use by police officers has caused death or injury from improper firearms discharges. The Interim Order requires an arbitrary and demeaning intrusion into the privacy of officers at a time when they are already under great stress, for no reason other than the fact that they were involved in an incident that, in all likelihood, gravely threatened their own safety, in defense of the public.

The Fourth Amendment does not permit such unjustified invasions of privacy and dignity. It requires, instead, that the Police Department have an individualized suspicion of wrongdoing before it demands such tests in the course of an investigation. Even if the Police Department could show "special needs" justifying its departure from the requirement for individualized suspicion, the Interim Order would fail because the Police Department has not advanced a rationale for its testing program – and it certainly has not identified an interest that justifies an intrusion on a police officer's constitutional right to be free from unreasonable searches and seizures.

# ARGUMENT

Preliminary injunctive relief should be granted if the moving party shows (1) irreparable harm, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Covino* v. *Patrissi*, 967 F.2d 73 (2d Cir. 1992) (preliminary injunction); *McGraw-Hill* v. *Ingenium Tech. Corp.*, 364 F. Supp. 2d. 352, 355 (S.D.N.Y. 2005) (temporary restraining order). All are present here.

## A.    Irreparable Injury

The first requirement is easily satisfied here. The right to be free from unreasonable searches is a fundamental constitutional right, and the threatened deprivation of that right constitutes irreparable injury. *Id.* at 77 (citing *Mitchell* v. *Cuomo*, 748 F.2d 804, 806 (2d Cir. 1986)). Absent injunctive relief, future deprivations of those rights are a virtual certainty. In the brief time since the Interim Order went into effect on September 30, 2007, four officers already have been subjected to testing. Nicholson Decl. ¶ 5. Without injunctive relief, it is likely that other such incidents will result in the unconstitutional search of police officers in the immediate future. Nicholson Decl. ¶ 6.

## B.    Likelihood of Success On The Merits

The Fourth Amendment protects the right to be secure "against unreasonable searches and seizures."[1] The government's effort to obtain physical evidence through Breathalyzer, urine, and blood tests is subject to the requirements of the Fourth

---

[1] The Constitution of the State of New York also protects this privacy right. Article 1, Section 12 contains language identical to the Fourth Amendment of the U.S. Constitution.

2

Amendment, both because of the "seizure" of the person that inheres in the demand for the test and because of the intrusion of privacy interests associated with the search. *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602, 616-617 (1989). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Indianapolis* v. *Edmond*, 531 U.S. 32, 37 (2000).

The Interim Order, on its face, eschews any reliance on "individualized" suspicion of wrongdoing as a prerequisite for the search and seizure. It requires testing in *every* case in which "a uniformed member of the service, on or off duty, is involved in a firearms discharge within New York City which results in injury to or death of a person." Testing is required even if it is abundantly clear that the firearms discharge was necessary and appropriate in the circumstances, and even in the absence of any indication that the officer had consumed or was under the influence of alcohol.

Because testing is required even in the absence of individualized suspicion,[2] it can be sustained against a Fourth Amendment challenge only if the defendants can demonstrate *both* that (1) the search "is justified by a special need beyond the ordinary needs of normal law enforcement," *and* (2) "the search was reasonable in light of that special need * * * weighing the government's interest against the intrusion on the * * * privacy interests." *United States* v. *Amerson*, 483 F.3d 73, 80 (2d Cir. 2007).

### 1.    There is no "special need" for the testing

The Fourth Amendment permits suspicionless searches only if the government has a "special need" to conduct such searches, apart from ordinary law enforcement

---

[2] Testing is required absent *any* degree of individualized suspicion, so we do not address here the *quantum* of individualized suspicion that the Fourth Amendment requires in these circumstances, *i.e.*, whether "probable cause" or some lesser degree of suspicion is required.

purposes. For example, the unique circumstances associated with policing the border may justify searches at a fixed immigration checkpoint. See *Edmond*, 531 U.S. at 37-38 (discussing *United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976)). Highway sobriety checkpoints serve the special need to get drunk drivers off the road. *Id.* at 39 (discussing *Michigan Dept. of State Police* v. *Sitz*, 496 U.S. 444 (1990)). The characteristics of certain "closely regulated" businesses may justify appropriately limited administrative searches. *Id.* at 452 (discussing *New York* v. *Burger*, 482 U.S. 691 (1987)).

The Supreme Court has specifically recognized that special needs may justify suspicionless testing for the use of controlled substances, but has approved such testing only if the asserted special need "was one divorced from the State's general interest in law enforcement." *Ferguson* v. *Charleston*, 532 U.S. 67, 79 (2001).

The testing involved here does not address such a "special need" but is, instead, inseparable from the government's general law enforcement interest. The testing is performed by or under the supervision of the Internal Affairs Bureau, an entity charged with investigating officer corruption and serious misconduct (which the Police Department Patrol Guide defines as criminal misconduct of any kind). The entire testing process is to be videotaped, thus ensuring the availability of evidence for future legal proceedings. There is no limitation on the use of the test results in criminal prosecutions. The test procedures were devised by, and will be implemented by, the Police Department, the government's principal law enforcement agency. See *Charleston*, 532 U.S. at 84 (fact that test results are turned over to police "does not merely provide a basis for distinguishing of prior cases applying the 'special needs' balancing approach. * * * It also provides an affirmative reason for enforcing the strictures of the Fourth

4

Amendment."). More troubling is the fact that the results of the testing are virtually certain to end up in the hands of the District Attorney's Office, which is required to respond to police shootings involving injury or death.

The testing, moreover, is triggered by an event that is under investigation by the Police Department, and the individual officer is tested specifically because of his or her involvement in that event. In that respect, it is entirely unlike the practice of briefly detaining individuals to seek information that may be relevant to someone else's involvement in a crime, or the programmatic collection of DNA from all felons to create a database for use in future investigations. See *United States* v. *Lidster*, 540 U.S. 419, 425 (2004) ("an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual."); *Amerson*, 483 F.3d at 82 ("Because the purpose of collecting DNA samples is to obtain identifying information, not to uncover evidence or wrongdoing or to solve a particular crime, the imposition * * * is one in which 'by definition, the concept of individualized suspicion has little role to play.'") (quoting *Lidster*, 540 U.S. at 424).

The testing is also quite different from the testing that was approved under the "special needs" doctrine in *Nat'l Treasury Employees Union* v. *von Raab*, 489 U.S. 656 (1989). *Von Raab* upheld mandatory drug tests for certain Customs Service employees, including those who carried firearms. The Court held that individualized suspicion is not required for testing that "serves special government needs, beyond the normal need for law enforcement" (489 U.S. at 665), and concluded that the Customs Service had a special need to ensure that those who worked directly on drug interdiction and who used firearms did not suffer from the impaired perception and judgment that might be

5

associated with drug use. 489 U.S. at 670-671. But in *von Raab*, the test results could not be used in a criminal prosecution of the employee (*id.* at 663); the testing was required *before* the employee could be appointed to a position in which he would carry firearms, and thus served to prevent the creation of a dangerous risk; and every employee seeking a position that involved carrying firearms was tested (*id.* at 667). Here, the test results *can* be used in a criminal prosecution; the testing is done in response to a specific incident that is under investigation; and the only employees who are tested are those involved in that incident. It is precisely in circumstances like these that individualized suspicion is required before a search may be conducted. See *Amerson*, 483 F.3d at 82 (taking DNA samples "does not involve any suggestion that the individual is being suspected of having committed a crime. * * * Nor does it force the individual to provide evidence to exonerate herself from a crime in which the government had no reason to think she was involved.").

What is more, to the extent that there is a special need to ensure the fitness of those who use firearms, that need is already served by an extensive regime of testing police officers. McCabe Decl. ¶¶ 2-8. Much like the Customs employees in *von Raab*, New York City police officers are subject to testing as a prerequisite to their entry into the police force, as a prerequisite to certain appointments and promotions, and on a random basis. McCabe Decl. ¶¶ 2-8. The newly ordered tests are different. They are triggered by the *conduct* of an individual officer, not by the position he holds or seeks, and they are conducted as part of a police investigation of that conduct, not to assess an individual's fitness for a position voluntarily sought.

6

The distinction between law enforcement searches (where individualized suspicion is required) and searches justified by special needs other than law enforcement (where individualized suspicion is not required) is illustrated by *Skinner*. *Skinner* involved mandatory alcohol and drug testing of railroad crew members after major accidents occurred. The testing program was devised by the federal agency responsible for railroad safety, pursuant to its statutory authority to promote safety. The testing addressed a continuing and persistent problem of alcohol use on railroads, and followed more than a century of efforts to address the problem. 489 U.S. at 606. The agency developed a large factual record documenting extensive on-the-job intoxication and accident investigation reports finding a large number of accidents in which alcohol or drug use was a probable cause or contributing factor. *Id.* at 607. Notably, the Court found no indication that the results of the test had been turned over to law enforcement authorities. *Id.* at 621 n.5. The program was devised to promote railroad safety, "not to assist in the prosecution of employees." *Id.* at 620.

The origins of the testing program here are starkly different. The Police Department has made no finding that intoxication while on duty is a significant problem. It has not even suggested that the *possibility* of such a problem merits investigation. Nor has it made any finding that intoxication has contributed in any degree to shootings involving death or injury. The origin of the testing requirement here was *not* a demonstrated risk to public safety; rather, it was a political controversy arising from a shooting death. Absent any indication that New York City police officers have extensive and continual alcohol-related gun safety problems, there is simply no basis for finding

7

that the Police Department has a special need for its new alcohol testing program akin to the safety related reasons identified in *Skinner*.

The Police Department's policy differs from the policy at issue in *Skinner* in another important respect: it allows the test results to be used for investigative and prosecutorial purposes. Indeed, the Police Department's policy seems to have been drafted with law enforcement purposes in mind. The policy specifies that the Intoxilyzer test will be administered by trained technicians, videotaped by another law enforcement official, and maintained for "evidentiary purposes." Interim Order at 2. Such purposes presumably include the use of the evidence in disciplinary actions and prosecutions of the officer who is required to submit to testing. Under these circumstances, where the law enforcement objectives are apparent, individualized suspicion is required.

### 2.    Even if the testing serves a "special need," it is unreasonable

Even if the Police Department could show that the testing serves some "special need," that showing is the beginning of the Fourth Amendment analysis, not the end. "[T]he ultimate measure of the constitutionality of a governmental search is reasonableness." *Amerson*, 483 F.3d at 83 (citations and quotations omitted). To meet that standard, the government must show that the policy in question imposes reasonable searches calculated to advance an important governmental objective. See *von Raab*, 489 U.S. at 675. The Interim Order fails to meet that requirement because no important government objective is served, and the searches imposed are not reasonable.

In cases where the Supreme Court has approved the use of suspicionless searches, it has required that they be conducted in furtherance of important government goals. Indeed, the greater the need for the particular policy, the more likely it is that an intrusion

8

on privacy interests will be justified. The principle is illustrated by *Skinner*, where the Court held that promoting railway safety is an important federal objective, particularly given the long history of alcohol abuse in the industry and empirical information showing a link between on-the-job drinking and railway safety problems. 489 U.S. at 620. The converse of the finding in *Skinner* is also true: If there is *not* a pressing need for a particular government policy, an invasion of an individual's privacy rights is constitutionally impermissible. *Chandler* v. *Miller*, 520 U.S. 305, 323 (1997) ("[W]here, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."). Similarly, if the government does identify a legitimate purpose, but the policy does not further it (or furthers it only incidentally), an invasion of an individual's constitutional rights is not allowed. See *Edmond*, 531 U.S. at 46 (noting that a legitimate secondary purpose for a suspicionless search cannot justify the procedure if the primary purpose is illegitimate).

With regard to the alcohol testing at issue here, the Police Department has failed to identify an important goal that the policy clearly advances. The vague statement that the policy helps to ensure "the highest level of integrity at the scene of firearms discharges" offers little insight into the reasons for the policy, the concerns that led to its adoption, or the direness of the City's need for it. What is more, the facts surrounding the institution of the policy suggest that it was imposed to diffuse criticism over the highly publicized shooting death of a civilian and to ensure the availability of alcohol-related evidence in future police shooting cases, not to further an important governmental goal such as safety. See Complaint ¶¶ 14 - 30. The lack of a connection between the Interim Order and a safety related goal is borne out by the fact that there are no studies or

9

findings that support the conclusion that such a policy is needed. See Nicholson Decl. ¶ 4; McCabe Decl. ¶ 9. The absence of any such findings undermines any claim that the Interim Order effectively advances a safety interest (or even that it was issued with the promotion of safety as its primary purpose). See *Chandler*, 520 U.S. at 319 (overturning a suspicionless drug-testing requirement in part because "[n]othing in the record hints that the hazards respondents briefly describe are real and not simply hypothetical"). Indeed, Plaintiffs are aware of no information that would lead a reasonable person to conclude that alcohol-related shootings resulting in injury or death are a recurring problem within the New York Police Department such that the City of New York has an important need to address it. See London Decl. ¶ 6; Nicholson Decl. ¶ 4; McCabe Decl. ¶ 9.[3]

Nor can it be said that the Interim Order furthers the goal of deterring alcohol use among uniformed officers. Numerous regulations in place before the issuance of the Interim Order satisfactorily ensured the fitness and sobriety of police officers. McCabe Decl. ¶ 8; Nicholson Decl. ¶ 3; London Decl. ¶ 7. *See also* Complaint ¶¶ 31-40. Those provisions, which include assessments of fitness for duty and punishments (including termination), already deter on-duty and excessive off-duty intoxication, as does police officers' concern for their own well-being. Any additional deterrence that might result from the issuance of the Interim Order will be marginal, and the decrease in risk of injury

---

[3] In *Skinner*, there was good reason to suspect a link between employee impairment and railway disasters. The opposite is true here. There is no obvious connection between a police officer's discharge of a firearm, whether or not injury occurs, and the likelihood of impairment due to alcohol. If there were such a link, one would expect that the alcohol testing policy would apply to shootings by all police officers regardless of whether the shooting resulted in injury or death. The lack of comprehensiveness of the policy suggests that it is motivated by something other than safety.

10

to the public similarly minimal. Thus, in contrast to *von Raab*, it is highly unlikely that deterrence could be a credible rationale for the policy.

In any event, any incremental safety benefit that does result from the enforcement of the Interim Order does not outweigh the concomitant intrusion upon the police officers' privacy and insult to their dignity. The Interim Order requires police officers – in the immediate aftermath of a shooting involving injury or death – to submit to Breathalyzer or Intoxilyzer testing by another police officer. Rather than being commended for their bravery in circumstances that almost certainly involved grave danger, police officers involved in shootings are now treated like crime suspects. In the instances where the Interim Order has been applied to date, the officers involved were forced to submit to alcohol testing shortly after they faced armed perpetrators. Nicholson Decl. ¶ 5. (Not surprisingly, none of the officers was found to have been intoxicated. Nicholson Decl. ¶ 5.) The Fourth Amendment does not permit such unjustified invasions of privacy and dignity.

## CONCLUSION

Plaintiffs' Application for a Temporary Restraining Order and an Order to Show Cause for a Preliminary Injunction should be granted because Plaintiffs have shown that continued application of the Interim Order will result in irreparable injury in the form of further invasions of police officers' Fourth Amendment right to be free from unreasonable searches and seizures, and Plaintiffs are likely to prevail on the merits.[4]

---

[4] Plaintiffs have shown that they are entitled to a preliminary injunctive relief because they have demonstrated irreparable harm and a likelihood of success on the merits. Plaintiffs also have satisfied the alternative to the likelihood of success on the merits: They have demonstrated that there are sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward them.

Respectfully submitted,

OF COUNSEL:

Michael T. Murray
Office of the General Counsel of
the Patrolmen's Benevolent
Association of the City
of New York
40 Fulton St.
New York, New York 10038-1850
Telephone: (212) 775-4500

LAW OFFICES OF THOMAS P. PUCCIO

By: _Thomas P. Puccio_

Thomas P. Puccio
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP

Lawrence S. Robbins (LR-8917)
Donald J. Russell
Alison C. Barnes
Brian A. Pérez-Daple
1801 K Street, N.W.
Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Plaintiffs*

Dated: October 18, 2007

12