# EXHIBIT F

# PATROL GUIDE

| Section: Uniforms and Equipment | Procedure No:   204-08 |
|---|---|

| **FIREARMS** |
|---|
| **GENERAL REGULATIONS** |

| DATE ISSUED:<br>02/23/01 | DATE EFFECTIVE:<br>02/28/01 | REVISION NUMBER:<br>01-01 | PAGE:<br>1 of 2 |
|---|---|---|---|

**EQUIPMENT FIREARMS**

1. Be armed at all times when in New York City, unless otherwise directed, or except as provided in item 2 below, with:
   a. Service revolver/pistol or off duty revolver/pistol as specified in *P.G. 204-09, "Required Firearms And Equipment."*
2. Be unarmed at own discretion while off duty when:
   a. Possession of firearm, under the circumstances, would unnecessarily create a risk of loss or theft of the firearm, i.e., participation in sporting activities, attendance at beach and pool, etc., OR
   b. On vacation, OR
   c. Engaged in authorized off duty employment, OR
   d. Engaged in any activity of a nature whereby it would be advisable NOT to carry a firearm, OR
   e. There is any possibility that member may become unfit for duty due to the consumption of alcoholic intoxicants.

**NOTE**

*In those instances in which an off duty uniformed member is required to carry a firearm, the member concerned MUST CARRY either the regulation service revolver or pistol, or an authorized off duty revolver or pistol. A uniformed member who performs undercover duty and who has been authorized to carry a special weapon (see A.G. 305-05, "Authorization for Special Weapons") is permitted to carry the special weapon in lieu of the regulation firearms specified in P.G. 204-09 while off duty. The carrying of these firearms while off duty applies within the City and State of New York and also in those states outside New York State which permit visiting police officers to carry firearms within their state boundaries by virtue of their status as police officers.*

3. Record all revolvers and pistols on **FORCE RECORD (PD406-143)**.
   a. Service revolvers/pistols, and off duty revolvers/pistols must conform to the specifications and standards of the Firearms and Tactics Section, Police Academy.
4. Do not modify revolvers or pistols without written permission of the Commanding Officer, Firearms and Tactics Section.
   a. Modifications permitted will be entered on **FORCE RECORD**.
5. Have service revolvers/pistols, and off duty revolvers/pistols not purchased at the Equipment Section inspected and tested by a Firearms and Tactics Section gunsmith prior to use.
6. Carry handguns (gun collections, etc.), other than service and off duty guns, only while enroute to or from practice range or similar activity.

**NOTE**

*When carrying such weapons, member must be armed with an authorized on duty or off duty firearm. The firearm being transported that is not authorized for on duty or off duty use shall be unloaded.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 204-08 | 02/28/01 | 01-01 | 2 of 2 |

**EQUIPMENT**
**FIREARMS**
**(continued)**

7. Safeguard weapons at all times.
8. Do not store or leave firearm in an unattended motor vehicle.
9. Do not carry firearms in briefcases, handbags, fanny packs, hip packs, tote bags, knapsacks, paper bags or similar devices.
10. Carry firearms, on the person, in an appropriate holster specifically designed to afford maximum protection against loss of weapon.

**NOTE**

*__All__ holsters, regardless of type, style, or design (i.e., ankle, shoulder or belt holster) must be specifically designed for the weapon being carried. "One size fits all," "Clip-on," and "belly band" holsters are __prohibited__.*

11. Use only approved Department issued ammunition for use in revolvers/pistols.
12. <u>For members authorized to carry service revolver</u> - Ensure that cylinder is fully loaded with appropriate ammunition. Maintain twelve (12) rounds of ammunition in two (2) speedloaders on duty belt.
    a. Keep twelve (12) extra rounds of ammunition in locker at primary place of duty *or* on the duty belt in two (2) ammo pouches.
13. <u>For members authorized to carry 9MM pistol</u> - Ensure that one (1) round of ammunition is in the chamber and fifteen (15) rounds in the magazine at all times.
    a. Maintain fifteen (15) rounds in each of the two (2) magazines carried on the duty belt.

**NOTE**

*Those uniformed members of the service authorized to carry specialized undercover firearms as per A.G. 305-05, "Authorization for Special Weapons," will also ensure that the maximum number of rounds are loaded in each magazine, and that a round is loaded in the chamber of the weapon, as applicable.*

14. Comply with *P.G. 205-03, "Responsibility For Weapons While Sick,"* if member expects to go on extended sick leave.
15. Carry ONLY authorized firearms when on duty.
    a. Permission of commanding officer is required PRIOR to carrying special weapons while performing duty (see *A.G. 305-05, "Authorization For Special Weapons")*.
16. Do not enter Family Court or Supreme Court Matrimonial Parts while armed if involved, OTHER THAN AS ARRESTING OFFICER OR ON OFFICIAL BUSINESS, in Family Court case or Supreme Court matrimonial case.
    a. Safeguard firearms at a location other than Family Court or Supreme Court OR if within New York City, the member concerned may elect to deliver firearm to desk officer of precinct in which Family Court or Supreme Court is located.
    b. Uniformed member of the service present at Family Court or Supreme Court as an arresting officer or on official business will report to the court officer supervisor and sign the Law Enforcement Officer log.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# EXHIBIT G



# PATROL GUIDE

| Section:  Disciplinary Matters | | Procedure No:   206-12 | |
|---|---|---|---|
| **REMOVAL OF FIREARMS FROM INTOXICATED UNIFORMED MEMBER OF THE SERVICE** | | | |
| DATE ISSUED:<br>10/10/03 | DATE EFFECTIVE:<br>10/17/03 | REVISION NUMBER:<br>03-04 | PAGE:<br>1 of 2 |

**PURPOSE**  
To determine if an on/off duty uniformed member of the service is unfit for duty due to intoxication.

**DEFINITION**  
<u>INTOXICATION</u> - Unfitness for duty due to the influence of alcohol, narcotics, or other drug, or under circumstances in which surrounding events of a timely nature indicate that the member may have been intoxicated during an earlier period directly related to the incident in question.

**PROCEDURE**  
Upon observing a uniformed member of the service who appears unfit for duty due to intoxication:

**SUPERVISORY MEMBER**  
1. Direct that member remain at Department facility or other location pending the arrival of commanding officer/duty captain.
2. Prepare, immediately, **SUPERVISOR'S FITNESS FOR DUTY REPORT (PD469-150)** based upon observations of member of the service.
3. Notify precinct commander/duty captain to respond to facility.

**COMMANDING OFFICER/ DUTY CAPTAIN**  
4. Prepare, immediately, **SUPERVISOR'S FITNESS FOR DUTY REPORT** based upon observations of member of the service.
5. Conduct an investigation to determine if member is unfit for duty due to intoxication at the time of the alleged misconduct.

**NOTE**  
*Common sense standards will be applied to determine whether a member of the service is unfit for duty due to intoxication. Commanding officers/duty captains will examine the totality of the circumstances and will consider all credible relevant information when determining a member's fitness for duty. Such information will include all* ***SUPERVISOR'S FITNESS FOR DUTY REPORTS*** *prepared, any witness statements made by civilians or members of the service, and any available scientific evidence (Breathalyzer, blood test, etc.). On the basis of all available information, viewed in light of the time elapsed since any alleged acts of misconduct or since the first supervisory observation of the member, the commanding officer/duty captain will conclude whether the member was unfit for duty at the time of the alleged misconduct.*

6. Remove firearms when it is determined that member is intoxicated (see *P.G. 206-17, "Removal And Restoration Of Firearms"*).
7. Place member on modified assignment or suspend from duty, as appropriate.
8. Advise member of availability of Counseling Service Program.

**NOTE**  
*A supervisory officer is mandated in all cases to contact the Counseling Services Unit on behalf of a member who is placed on modified assignment, suspended, or has his/her firearms removed due to being unfit for duty. The services of the Counseling Service Program are not available to personnel for illegal drug use and/or abuse problems.*

# NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 206-12 | 10/17/03 | 03-04 | 2 of 2 |

**COMMANDING OFFICER/ DUTY CAPTAIN** *(continued)*

9. Have supervisory officer contact Counseling Service **DIRECT**, during normal business hours. At other times, conferral with a counselor may be requested by contacting the Sick Desk supervisor.

10. Prepare five (5) copies of all completed **SUPERVISOR'S FITNESS FOR DUTY REPORTS** (commanding officer/duty captain's and referring supervisor's).

11. Prepare seven (7) copies of a report on **Typed Letterhead** detailing observations and circumstances that led to determination that member was unfit for duty and forward each, with copies of all **SUPERVISOR'S FITNESS FOR DUTY REPORTS**, as follows:
   a. First Deputy Commissioner - Original (DIRECT)
   b. First Deputy Commissioner (THOUGH CHANNELS)
   c. Chief of Department (DIRECT)
   d. Chief of Personnel (DIRECT)
   e. Deputy Commissioner - Trials
   f. Department Advocate's Office
   g. Member's commanding officer.

**ADDITIONAL DATA**

*Prior to final adjudication of a disciplinary matter, in all misconduct cases in which the use of alcohol is indicated, a conferral with the Early Intervention Unit must be made, and an alcoholism assessment by the Counseling Services Unit, must be conducted. In addition, in appropriate cases, final adjudication of the disciplinary matter will be held in abeyance pending completion of treatment for alcoholism. The Department Advocate's Office or the Office of the Special Prosecutor, as appropriate, are required to ensure that these steps are taken.*

**RELATED PROCEDURES**

*Cause For Suspension Or Modified Assignment (P.G. 206-07)*
*Suspension From Duty (P.G. 206-08)*
*Modified Assignment (P.G. 206-10)*
*Administration Of Drug Screening Tests For Cause (P.G. 205-30)*
*Removal/Restoration Of Firearms (P.G. 206-17)*

**FORMS AND REPORTS**

**SUPERVISOR'S FITNESS FOR DUTY REPORT (PD469-150)**
**Typed Letterhead**

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# EXHIBIT H

## PATROL GUIDE



| Section: Command Operations | Procedure No: 212-29 |
| --- | --- |

**FIREARMS DISCHARGE BY
UNIFORMED MEMBERS OF THE SERVICE**

| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
| --- | --- | --- | --- |
| 01/01/2000 | 01/01/2000 | | 1 of 9 |

**PURPOSE**     To record and evaluate incidents in which uniformed members of the service discharge firearms.

**NOTE**     *A firearms discharge does <u>not</u> include a discharge during an authorized training session or while lawfully engaged in target practice or hunting. Additionally, it does <u>not</u> include a firearms discharge at a firearms safety station within a Department facility. See ADDITIONAL DATA for accidental firearms discharge at a firearms safety station.*

**DEFINITION**     <u>PATROL BOROUGH SHOOTING TEAM</u> - Consists of, on an ad hoc basis, personnel assigned to the Borough Investigations Unit, Detective Bureau, Emergency Service Unit, community affairs officers, precinct patrol supervisors and precinct police officers.

<u>SHOOTING TEAM LEADER</u> - Each patrol borough shooting team will have as its leader one (1) of the following ranking officers: Commanding Officer, Borough Investigations Unit <u>or</u>, one (1) of the number of captains designated by the borough commander and approved by the Chief of Department.

**NOTE**     *When appropriate, the shooting team leader can request the assistance of personnel assigned to the Internal Affairs Bureau, Office of Deputy Commissioner - Public Information, Office of Deputy Commissioner - Community Affairs, Office of Deputy Commissioner - Legal Matters, etc. However, in all cases involving an injury as a result of a firearms discharge, a notification regarding the incident <u>must</u> be made to the Internal Affairs Bureau, Command Center. Additionally, borough commanders will implement a plan to equitably distribute shooting investigations among shooting team leaders and ensure their availability, whether on or off duty, at all times.*

<u>INVESTIGATING OFFICER</u> - <u>Shooting team leader</u> conducts investigation, whenever a uniformed member of the service discharges a firearm, and signs required report, under the supervision of:

a.     Duty inspector when <u>no</u> personal injury occurs <u>or</u> when a perpetrator or bystander sustains a non-serious firearms injury

b.     Duty chief when anyone is killed or seriously injured by gunshot <u>or</u> a uniformed member of the service is injured by gunshot.

**NOTE**     *When <u>no</u> shooting team leaders are on duty and a uniformed member of the service discharges a firearm which results in an injury, the patrol borough concerned will activate a shooting team leader from off-duty. In such cases, the precinct commanding officer/ duty captain will respond to the scene and take charge of the investigation. When the shooting team leader arrives, the leader will be briefed by the precinct commanding officer/duty captain and will thereupon assume responsibility for the investigation (see Appendix "A").*

*<u>Commanding/executive officer, precinct of occurrence/duty captain</u> conducts investigation and signs required report, under the supervision of the duty inspector, whenever a uniformed member of the service discharges a firearm under circumstances where there:*

## NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 2 of 9 |

**NOTE**
**(continued)**

    a.    *Is no injury to a person, and*
    b.    *No shooting team leaders on duty.*
*(Commanding officers of Transit Bureau districts and Housing Bureau police service areas where the incident occurred, if on duty at the time of the shooting, will perform this function when the incident involves uniformed members of the service within their respective jurisdictions (see Appendix "A").*

*Interim and final reports on firearm discharges, initially reported by shooting team leaders, will be the responsibility of the Commanding Officer, Patrol Borough Investigations Unit. The commanding officer, precinct of occurrence, will be responsible for interim and final reports initially investigated by non-shooting team ranking officers (see Appendix "A").*

**PROCEDURE**    When a uniformed member of the service discharges a firearm either on or off-duty:

**UNIFORMED**    1.    Request patrol supervisor, and:
**MEMBER OF**            a.    Call for ambulance and render assistance to injured, if necessary
**THE SERVICE**            b.    Safeguard the scene.

**NOTE**    *If firearm is discharged outside New York City, uniformed member of the service concerned will promptly report discharge to local police authorities and the Operations Unit, either personally or by responsible messenger. Pursuant to the investigation of these incidents, investigating officers may use Department vehicles without obtaining prior permission, if responding outside the City but within the residence counties. Incidents occurring outside the City but within the residence counties will be investigated as follows:*
    a.    *Patrol Borough Bronx will assign an investigating officer to conduct investigations in Westchester, Rockland, Orange or Putnam Counties.*
    b.    *Patrol Borough Queens South and Patrol Borough Queens North will alternately assign an investigating officer to conduct investigations in Nassau or Suffolk Counties.*

**PATROL**    2.    Respond to scene and take command.
**SUPERVISOR**           a.    Establish crime scene, if necessary
            b.    Notify the desk officer.

**DESK OFFICER**    3.    Notify precinct commanding officer/executive officer, Operations Unit and patrol borough command, without waiting for details.
            a.    Notify Internal Affairs Bureau, Command Center, <u>immediately</u>, if an injury is involved.

**OPERATIONS**    4.    Notify duty chief.
**UNIT**

**PATROL**    5.    Notify:
**BOROUGH**           a.    Duty inspector
**COMMAND**           b.    Appropriate investigating officer, i.e., duty captain, shooting team leader.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 3 of 9 |

**DUTY INSPECTOR**
6. Respond to scene, and:
    a. Confer with commanding officer or executive officer/duty captain/shooting team leader.

**INVESTIGATING OFFICER**
7. Respond to scene and conduct investigation.
8. Notify District Attorney's Office in <u>all</u> shooting cases.
    a. Confer with District Attorney before interviewing uniformed member(s) of the service.

*NOTE*
    *Unresolved issues with the District Attorney will be brought to the attention of the duty inspector/duty chief and be guided by their direction.*

9. Interview:
    a. Witnesses
    b. Other persons involved
    c. Uniformed member concerned, if appropriate.
10. Direct patrol supervisor to inspect firearms for evidence of recent discharge (i.e., presence of spent rounds).
    a. Have Firearms Analysis Section notified if firearm was discharged.

*NOTE*
    *If anyone was injured as a result of police firearms discharge, direct patrol supervisor to secure all weapons that were discharged. A member assigned to the Borough Investigations Unit <u>will</u> <u>transport</u> the firearm(s) to the Firearms Analysis Section.*

11. Direct uniformed member concerned to prepare **FIREARMS DISCHARGE/ASSAULT REPORT (PD424-151)**.
    a. Direct patrol supervisor to prepare **REPORT**, if uniformed member concerned is incapacitated.
12. Assign uniformed member(s) of the service involved, <u>temporarily</u>, to patrol borough office of assignment, or counterpart, for a minimum of three (3) consecutive scheduled tours (exclusive of sick time or regular days off), <u>if firearms discharge causes death or injury</u>.
13. Notify Operations Unit and patrol borough command of details of investigation and temporary assignment of uniformed member concerned, if such assignment was made.
14. Prepare report on **Typed Letterhead**, addressed to the Chief of Department, based on "Firearms Discharge Manual, A Guide to the Preparation of a Shooting Incident Report."
    a. Include findings as to whether firearms discharge was <u>within</u> or <u>outside</u> Department guidelines, if investigation is completed, <u>and</u>
    b. Include any recommendations, as per the following schedule:
        (1) FINDINGS
            (a) No violation of Department firearms guidelines
            (b) Violation of Department guidelines
            (c) Accidental discharge - violation
            (d) Accidental discharge - no violation

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 4 of 9 |

**INVESTIGATING**
**OFFICER**
**(continued)**

(2)    RECOMMENDATIONS

    (a)    No corrective action to be taken

    (b)    Member concerned to review the law and instructions

    (c)    Member concerned to have additional firearms instructions

    (d)    Retraining in tactics re: _____

    (e)    Current assignment of member be reviewed

    (f)    Other (Command Discipline, Charges and Specifications, etc.) re: _____

**NOTE**

*Ordinarily, there will be one (1) "finding" per firearms discharge incident and one (1) or more "recommendations" about follow-up action to be taken. However, an incident involving multiple firearms discharges by an individual uniformed member of the service may have more than one (1) "finding." For example, an incident wherein two (2) rounds are fired may have a "finding" that one (1) discharged round was "No violation of Department firearms guidelines," and the other fired round was a "Violation of Department guidelines." In these split "findings" cases, the investigating officer will clearly specify the nature of each fired round.*

*In many cases the investigating officer's determination about the shooting being "within/outside" the Department's guidelines will be reserved for the future when the investigation is completed, e.g., following the interview of uniformed member concerned (see P.G. 206-13, "Interrogation of Members of the Service", presentation to grand jury, or completion of a criminal trial. However, other co-relative decisions will not be postponed. For example, regarding behavior or violations of Department guidelines, immediate action will be taken when the member's behavior is erratic, e.g., refer to Psychological Services, if appropriate, or derelictions are uncovered, e.g., initiate disciplinary actions. These actions will be described in the initial report in its "Miscellaneous" section.*

    c.    Indicate in report the time and date uniformed member concerned was temporarily assigned to patrol borough/ counterpart command.

15.    Review and sign report.

    a.    Distribute as follows:

        (1)    <u>Original and first copy</u> - to Chief of Department's Investigation Review Section, Firearms Discharge Review Board, Room 1100A, Police Headquarters, <u>DIRECT</u>.

            (a)    Attach <u>first copy</u> of **FIREARMS DISCHARGE/ ASSAULT REPORT**.

        (2)    <u>Copy</u> - Deputy Commissioner, Policy and Planning, (if death or injury)

            Chief of Department

            Chief of Patrol

            Chief of Housing Bureau, if appropriate

            Chief of Personnel

            Chief of Transit Bureau, if appropriate

            Commanding Officer, Firearms and Tactics Section

            Patrol borough commander

            Uniformed member's commanding officer, if other than precinct of occurrence.

16.    Distribute remaining copies of **FIREARMS DISCHARGE/ASSAULT REPORT,** as indicated on form.

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 5 of 9 |

**PATROL BOROUGH/ COUNTERPART COMMANDER**

17.  Prepare report on **Typed Letterhead** for bureau chief concerned reviewing temporary assignment of uniformed member(s) of the service concerned.
   a.  Recommend continuance or discontinuance, as appropriate.

*NOTE*

*Uniformed member(s) of the service involved in such incidents will not be returned to permanent command without prior approval of Chief of Department.*

**COMMANDING/ EXECUTIVE OFFICER, MEMBER CONCERNED**

18.  Conduct <u>informal</u> interview of uniformed member(s) concerned, <u>after</u> initial investigation is completed.
   a.  Inquire about uniformed member's well being
   b.  Offer any assistance deemed appropriate including the services of the Counseling Services Unit, Employee Relations Section (see *P.G. 205-08, "Trauma Counseling Program").*
19.  Conduct a follow-up interview of the uniformed member concerned within twenty-four (24) to forty-eight (48) hours.
   a.  Observe uniformed member's post trauma reaction.
   b.  Repeat offer of the Counseling Services Unit services.

**COMMANDING OFFICER, BOROUGH INVESTIGATION UNIT/PCT OF OCCURRENCE**

20.  Prepare <u>final report</u> on **Typed Letterhead** <u>within ninety (90) days of the incident.</u>
   a.  Submit interim reports on a monthly basis, if unable to comply within ninety (90) days, indicating reason for delay, e.g., District Attorney requested delaying interview of uniformed member(s) concerned, etc.
   b.  Include, in the <u>final report</u>, all information <u>not</u> available at the time of the initial report, <u>and</u>
      (1)  Findings and recommendations
      (2)  Medical Examiner's report
      (3)  Ballistics report
      (4)  Department Gunsmith's report (accidental discharges)
      (5)  Synopsis of uniformed member(s) statements
      (6)  Statement that Communications Section tapes were audited and are consistent or not consistent with uniformed member(s)/witnesses' statements
      (7)  District Attorney/grand jury findings, if applicable
      (8)  Internal Affairs Bureau findings, if applicable.
21.  Forward report to Chief of Department, as follows:
   a.  <u>Original</u> - <u>DIRECT</u> to Chief of Department's Investigation Review Section
   b.  <u>Duplicate</u> - through channels.

*NOTE*

*The Commanding Officer, Investigation Review Section will note all cases not finalized by the first anniversary of their occurrence due to a District Attorney's request to refrain from interviewing the uniformed member of the service under P.G. 206-13, "Interrogation of Members of the Service." A report of these cases will be forwarded to the Deputy Commissioner-Legal Matters. The Deputy Commissioner-Legal Matters will confer with the appropriate District Attorney to expedite judicial proceedings so that the shooting investigation can be finalized without undue delay. The Deputy Commissioner-Legal Matters will report the results of his/her conferral on **Typed Letterhead** to the Chief of Department.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 6 of 9 |

**PATROL BOROUGH COMMANDER**

22.   Call meeting of borough Firearms Discharge Review Board on a monthly basis.

**BOROUGH FIREARMS DISCHARGE REVIEW BOARD**

23.   Review incident and sustain/alter findings and recommendations previously made.
24.   Prepare report, addressed to the Department Firearms Discharge Review Board, containing findings and recommendations per the schedule in step 14.

**NOTE**

*Each member must sign report.*

**PATROL BOROUGH COMMANDER**

25.   Endorse findings and recommendations to Chief of Department's Firearms Discharge Review Board including:
    a.   Summary of findings
    b.   Indication of concurrence with findings and recommendations
    c.   Current duty status and assignment of uniformed member(s) concerned.

**ADDITIONAL DATA**

<u>*FIREARMS DISCHARGE BY UNIFORMED MEMBERS OF THE SERVICE*</u>

*Investigating officers conducting the preliminary investigation will attempt to ascertain and note in the preliminary report on **Typed Letterhead**, any action, statement, clothing or equipment utilized by <u>civilian clothed</u>, uniformed members of the service concerned to identify the uniformed member(s) as police officers (see step 13, "Firearms Discharge Manual," [M.O.S. Description]). Additionally, the investigating officer preparing the final report on **Typed Letterhead** will include any additional information concerning identification which is obtained during the course of the subsequent investigation, including information obtained through interviewing civilian witnesses and/or the uniformed member(s) concerned, pursuant to the provisions of P.G. 206-13, "Interrogation of Members of the Service."*

*If a person is killed as a direct result of police action, the uniformed member of the service involved will <u>not</u> be assigned to identify the body at the morgue. Another uniformed member of the service, who can identify the body, will be assigned.*

*While a firearms discharge at a safety station within a Department facility does not require a report based on the "Firearms Discharge Manual" as per step 14 of this procedure, it does require a brief report by the uniformed member's commanding officer to the Commanding Officer, Firearms and Tactics Section.*

*In all cases of firearms discharge, the firearm of the uniformed member concerned will be delivered to and examined by the Firearms Analysis Section. If accidental discharge of a firearm is alleged, the investigating officer will direct that after Firearms Analysis Section examination, the firearm be delivered to the Firearms and Tactics Section, Outdoor Range, at Rodman's Neck for examination by a Department gunsmith. Department gunsmiths are available Monday to Friday, 0730 to 2300 hours. Uniformed member(s) concerned will not use the firearm(s) in question until such examination is completed (see P.G. 204-12, "Repair/Replacement of Authorized Firearms"). If uniformed member's service revolver/pistol has accidentally discharged and the incident occurs when a Department gunsmith is not available, the uniformed member concerned will be assigned to non-enforcement duty pending repair or replacement of the firearm.*

## NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 7 of 9 |

**ADDITIONAL DATA (continued)**

The **FIREARMS DISCHARGE/ASSAULT REPORT** is the primary method used by the Department to gather intelligence information regarding incidents which are life-threatening for police officers. The effectiveness of tactics training in identifying dangerous new criminal practices and in promoting safe new habits by uniformed members of the service depends upon the accuracy and completeness of these reports.

<u>FIREARMS DISCHARGE INVESTIGATIONS-ACCIDENTAL DISCHARGES AND SELF-INFLICTED WOUNDS</u>

During the initial investigation of an incident involving a firearm discharge by a member of the service), information sometimes indicates that the firearm was discharged under accidental circumstances (with or without injury or death), or may have apparently been a self-inflicted wound. In all such cases, the ranking officer responsible for conducting the investigation <u>must</u> determine whether the firearms removal procedure (P.G. 206-17, "Removal And Restoration Of Firearms) would be appropriate.

All firearms discharge investigation reports under accidental circumstances shall include a finding and recommendation under Miscellaneous Information (Para. 25 - standard format) whether or not the member's firearms should be removed. In all cases of apparently self-inflicted wounds, absent mitigating circumstances, firearm removal is <u>mandatory</u>.

Members do <u>not</u> have to be suspended or placed on modified assignment in order to have their firearms removed. When the ranking member conducting the investigation determines that a firearms removal is appropriate, P.G. 206-17, "Removal And Restoration Of Firearms," shall be followed.

The circumstances of each case shall be judged on their own merit. Factors such as on/off duty status, fitness for duty, contributing circumstances (e.g., struggle with suspect), shooting range incidents etc., shall be considered in making a determination about the necessity of firearms removal.

When firearms removal would not be appropriate, if an accidental discharge of a firearm is alleged, the investigating officer will direct that after ballistics examination, the firearm be delivered to the Firearms and Tactics Section, Outdoor Range, at Rodman's Neck for examination by a department gunsmith (gunsmiths are available Monday to Friday, 0730 to 1530 hours). Members concerned will not use firearm in question until such examination is completed (see P.G. 204-12, "Repair/ Replacement of Authorized Firearms"). If member's service firearm has accidentally discharged and the incident occurs when a department gunsmith is not available, such member will be assigned to non-enforcement duty pending repair or replacement of the firearm.

In all firearm discharge cases, the ranking investigator shall determine whether a referral should be made to the Early Intervention Unit, Counseling Service, or Trauma Counseling Program. When a member is shot, or causes, accidentally or otherwise, serious injury or death to another, the member will be referred to the Trauma Counseling Program.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 8 of 9 |

**ADDITIONAL DATA (continued)**

*All uniformed members of the service who discharge a firearm, on or off duty, at other than an approved firing range, will attend a tactics review session conducted by the Firearms and Tactics Section. The dates, times, locations, required equipment, and other provisions governing the review sessions will be the subject of a yearly Department directive.*

**RELATED PROCEDURES**

*Interrogation of Members of the Service (P.G. 206-13)*
*Line of Duty Injury or Death Occurring Within City (P.G. 205-05)*
*Line of Duty Injury or Death Occurring Outside City in Residence Counties (P.G. 205-06)*
*Removal and Restoration of Firearms (P.G. 206-17)*
*Trauma Counseling Program (P.G. 205-08)*
*Repair/Replacement of Authorized Firearms (P.G. 204-12)*
*Boards and Committees (O. G. 101-23)*

**FORMS AND REPORTS**

**FIREARMS DISCHARGE/ASSAULT REPORT (PD424-151)**
**Typed Letterhead**

## RESPONSIBILITY FOR SHOOTING INVESTIGATION

### Type of Shooting

| | No Injury | Injury Initial Report |
|---|---|---|
| Duty Captain | See Note. | No. However, he/she will promptly respond to scene and initiate investigation until the arrival of the Shooting Team Leader. |
| Shooting Team Leader | Yes, if on duty at time of the firearm discharge. | Yes. |
| C.O. (X.O.) of Housing Bureau PSA (Area of Occurrence) | See Note. | No. However, if on-duty, he/she will promptly respond to scene and initiate investigation with the assistance of the Duty Captain until the arrival of the Shooting Team Leader. |
| C.O. (X.O.) of Transit District (Area of Occurrence) | See Note | No. However, if on-duty he/she will promptly respond to scene and initiate investigation with the assistance of the Duty Captain until the arrival of the Shooting Team Leader. |

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 9 of 9 |

**NOTE**

*All firearms discharges by uniformed members of the service will be investigated by a Shooting Team Leader if one is on duty at the time of the shooting. If none is on duty and anyone is injured by a firearms discharge, the borough will activate a Shooting Team Leader from off duty status. If none is on duty and no one has been injured, the investigation will be conducted by the duty captain concerned. (This function will be performed by the Commanding Officer or Executive Officer, precinct of occurrence, if he/she is on duty. In addition, non-injury shootings involving on duty uniformed members of the service assigned to the Housing Bureau and Transit Bureau, when occurring on Housing or Transit facilities, will be conducted by the Commanding Officer of the PSA concerned or the Commanding Officer of the transit district concerned if he/she is on duty at the time of the shooting.) Further, if an incident involves firearms discharges by multiple officers assigned to the Housing Bureau or Transit Bureau and other Department bureaus, the investigation will be conducted by the Patrol Services Bureau Duty Captain.*

*Interim and final reports relative to police shootings will be prepared by:*
*The Commanding Officer, Borough Investigations Unit concerned whenever the initial report is prepared by a Shooting Team Leader.*

*The Commanding Officer, precinct of occurrence whenever the initial report is prepared by a non-Shooting Team Leader.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# EXHIBIT I

# PATROL GUIDE



| Section: Command Operations | Procedure No: 212-53 |
|---|---|

**COMMAND RESPONSIBILITIES WHEN A
PERSON DIES OR SUSTAINS A SERIOUS INJURY
IN CONNECTION WITH POLICE ACTIVITY**

| DATE ISSUED: 01/01/2000 | DATE EFFECTIVE: 01/01/2000 | REVISION NUMBER: | PAGE: 1 of 3 |
|---|---|---|---|

**PURPOSE**

To establish command responsibility and notification requirements when a person dies, is seriously injured in connection with a police activity, or sustains an injury resulting from a police firearms discharge.

**DEFINITION**

<u>POLICE ACTIVITY</u> - includes, but is not limited to:
a.    Any death while in police custody.
b.    Serious injury suffered by a person (prisoner/EDP) prior to police custody, (i.e., community intervention prior to police arrival, etc.) self inflicted serious injury.
c.    Police use of force resulting in serious injury.
d.    Death or serious injury to a person fleeing from a police foot or vehicle pursuit.
e.    Serious physical injury of a person resulting from police restraint, (i.e., EDP).
f.    Any injury to a person resulting from a police firearms discharge.

**PROCEDURE**

When a person dies, is seriously injured in connection with a police activity, or sustains an injury resulting from a police firearms discharge:

**UNIFORMED MEMBER OF THE SERVICE**

1.    Immediately request the response of the patrol supervisor, and
    a.    Safeguard possible crime scene.
    b.    Provide and/or secure appropriate medical attention for the injured person.

**PATROL SUPERVISOR**

2.    Respond to scene, assess the situation.
3.    Notify the desk officer.
4.    Establish crime scene, if necessary.

**DESK OFFICER**

5.    Make the following notifications:
    a.    Borough command
    b.    Operations Unit
    c.    Commanding officer/duty captain
    d.    Internal Affairs Bureau, Command Center
    e.    Detective squad and borough commands.

**OPERATIONS UNIT**

6.    Notify duty chief.

**PATROL BOROUGH COMMAND**

7.    Notify duty inspector.
8.    Notify shooting team leader when:
    a.    Injury occurs as a result of a police shooting.
    b.    Requested by duty inspector regarding a death in custody or serious injury in connection with police activity.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-53 | 01/01/2000 | | 2 of 3 |

**NOTE**    *Notifications to next of kin in ALL cases where a person dies while in police custody will be the responsibility of the Borough Commander and/or a member of their staff.*

**DUTY**
**INSPECTOR**

9.   Respond to scene.
10.  Confer with commanding officer/duty captain/shooting team leader.
11.  Confer with Internal Affairs Bureau Response Team.

**IAB RESPONSE**
**TEAM**

12.  Respond to scene.
13.  Confer with commanding officer/duty captain/shooting team leader.
14.  Advise Internal Affairs Bureau Duty Captain, as appropriate.

**COMMANDING**
**OFFICER/**
**DUTY CAPTAIN/**
**SHOOTING**
**TEAM LEADER**

15.  Respond and assess the situation.
16.  Confer with Internal Affairs Bureau Duty Captain/Internal Affairs Bureau Response Team.

WHEN IT IS DETERMINED THAT A POSSIBLE CRIMINAL INVESTIGATION WILL COMMENCE:

**INTERNAL**
**AFFAIRS**
**BUREAU,**
**DUTY CAPTAIN**

17.  Respond and assess the circumstances.
18.  Confer with the commanding officer/duty captain/shooting team leader.

**PATROL**
**SERVICES**
**BUREAU**
**DUTY CHIEF**

19.  Respond to scene and assume command.
20.  Confer with duty inspector/commanding officer/duty captain/shooting team leader, and Internal Affairs Bureau Duty Captain to determine if a criminal investigation against a member of the service is warranted.
21.  Assume responsibility for the non-criminal investigation when:
     a.   Person dies in custody.
     b.   Person sustains any injury resulting from police firearms discharge.
     c.   Person sustains a serious injury in connection with a police activity.

**NOTE**    *When a criminal investigation against a member is required, the Internal Affairs Bureau will be responsible for the investigation.*

IF CRIMINAL INVESTIGATION AGAINST A MEMBER IS REQUIRED:

**PATROL**
**SERVICES**
**BUREAU**
**DUTY CHIEF**

22.  Confer with the Chief of Detectives and Chief of Internal Affairs, as appropriate.
23.  Coordinate the activities of the Detective Bureau and Internal Affairs Bureau personnel.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-53 | 01/01/2000 | | 3 of 3 |

**NOTE**
*In those cases where no criminal investigation by the Internal Affairs Bureau is required the follow-up investigation, including interviews conducted under P.G. 206-13, "Interrogation Of Members Of The Service" will be conducted by the borough commanding officer or designee.*

*If at any time during the investigation, it becomes apparent that a criminal investigation is required, the Internal Affairs Bureau will be notified and will take over responsibility for the criminal investigation, including any additional interviews.*

**ADDITIONAL DATA**
*When it is determined that the Internal Affairs Bureau will conduct the investigation, the local detectives will provide assistance (e.g., canvass interviews, etc.), as necessary. Conversely, when it is determined that Detective Bureau personnel will conduct the investigation, the Internal Affairs Bureau will provide assistance as requested by the Detective Bureau. The patrol borough Investigations Unit will also participate in these investigations, where warranted.*

*When, in the course of an investigation, (i.e., investigate DOA), a member of the Detective Bureau becomes aware that a death or serious injury was or may have been in connection with a police action, the precinct commanding officer/duty captain and the Internal Affairs Bureau will be immediately notified.*

*Whenever a person dies while in police custody or sustains death or serious injury in connection with a police activity, or sustains death or injury resulting from a police firearms discharge, forward copy of **Typed Letterhead** to Deputy Commissioner - Policy and Planning, 1 Police Plaza, Room 1403.*

**RELATED PROCEDURES**
*Interrogation of Members of the Service (P.G. 206-13)*

**FORMS AND REPORTS**
**Typed Letterhead**

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# EXHIBIT J

**REPORT UNDER:**
**PATROL GUIDE 212-29**
**CDFDRB #**          03-45
**SCBN FDRB #**          03-12

## POLICE DEPARTMENT
## CITY OF NEW YORK

May 22, 2003

From:          Shooting Team Leader, SATCOM., Brooklyn North

To:          Chief of Department

Subject:          **FIREARMS DISCHARGE BY AN ON-DUTY, PLAINCLOTHED, MEMBER OF THE SERVICE WITHIN THE CONFINES OF THE 77 PRECINCT. SUBJECT AND PLAINCLOTHESED MEMBER EACH RECEIVED NON-LIFE-THREATENING GUNSHOT INJURIES. THE SUBJECTS TWO FIREARMS WERE RECOVERED. NO PROPERTY DAMAGE.**

1.     **OPENING:**

On Thursday, May 22, 2003, at approximately 0013 hours, P.O. ***** *****, tax # *****, 77 Anti-Crime Unit, discharged a firearm seven (7) times at a subject. That weapon had been recovered from the subject during a Stop and Frisk encounter. Those discharges caused the subject to sustain several gunshot wounds. Officer ***** sustained a single gunshot injury to his right foot in addition to receiving a gunshot strike to his Department issued vest. The hit to his vest caused Officer ***** to sustain blunt trauma and lacerations to his chest. One additional firearm was recovered at the scene, in the immediate vicinity of the subject following the exchange. No property damage was incurred. Details are as follows.

2.     **INVESTIGATION:**

This firearms discharge was investigated by the undersigned, Captain Timothy J. Trainor, Shooting Team Leader, S.A.T. COM., Brooklyn North, under the direction and supervision of Deputy Inspector James P. O'Connell, Commanding Officer, 77 Precinct, and Assistant Chief Joseph F.X. Cunneen, C.O., SATCOM Brooklyn North, with the assistance of personnel from the S.A.T. COM., Brooklyn North Investigations Unit.

37

3.    **PERSONS INVOLVED:**

A.    **Member of the Service-Subject**

Police Officer ***** *****, Shield # *****, Tax # *****
Command: 77 Pct.  Tour: 1730 X 0205
Assignment: 77 Anti-Crime

B.    **Member of the Service-Witness**

Police Officer ***** *****, Shield # *****, Tax # *****
Command: 77 Pct.  Tour: 1730 X 0205
Assignment: 77 Anti-Crime

C.    **Civilian Subject**

Martin Diggs, AKA: Martin Jones and Jesus Jones
NYSID # 6149438J, DOB: 11/27/72
487 Carlton Avenue also 47 Carlton Avenue, 1305 Loring Avenue

4.    **NARRATIVE:**

On Thursday, May 22, 2003, Officer's ***** and *****, both assigned to 77 Precinct Anti-Crime, were patrolling the area around Carlton Avenue and Dean Street, pursuant to a robbery pattern that was identified in the area. At approximately 0001 hours, a radio transmission of a suspicious male in the vicinity of 198 St. Mark's Avenue, Carlton Avenue to Vanderbilt Avenue, was received. Officer's ***** and ***** drove to St. Mark's Avenue where they encountered a male on the street. They identified themselves verbally as police officers and inquired as to what he was doing and if he saw anything unusual. He informed them that he had just left his residence. The male then continued on his way. Shortly thereafter, Officer ***** was driving north on Carlton Avenue from Bergen Street. He and Officer ***** then observed two males walking on the east side of the street. One of the men they recognized was the male they had spoken with minutes before. The lead male reached the stoop of a brownstone on Carlton Avenue south of Dean Street and entered onto the property. The following male continued towards the Brownstone where the first male had entered. It appeared to them that the following male was about to possibly rob the first male. As they approached the second male, he observed them and turned to continue north on Carlton Avenue. Officer ***** drove across Dean Street and stopped abreast of the male. After identifying themselves as police officers, they asked the male what he was doing. The male said to them that he had already explained his actions to them shortly before. He asked the male his address to which he responded either 64 or 46 Classon Avenue. They realized that that address was not anywhere near the vicinity of where they had originally encountered the male. With their suspicions heightened they exited the vehicle to approach the male. Officer ***** moved forward of a parked vehicle as Officer ***** passed to the rear. They both approached the male to

continue questioning him. As they approached, the male appeared to become defensive and backed away towards a nearby iron fence. As he was doing so he made repeated movements with his right hand towards his rear waistband. At that time the male said to them that he did not want to go back to jail. Officer *****, believing that the male was reaching for something, grabbed the male's right arm while Officer Garrito grabbed his left arm. While taking this action a firearm, a black Smith & Wesson .40 caliber semi-automatic fell to the ground from the rear waistband of the male. Officer ***** called out to Officer ***** "92" (their signal to each other indicating an immediate arrest). A struggle ensued, with the male now reaching towards his front waistband. As they attempted to handcuff the male, all three fell to the ground during the struggle. While Officer ***** was atop the male struggling with him, he heard more than one gunshot and felt the effect of the rapports. With that, he attempted to back off the male; and, in doing so, sees that his partner is also backing off the male. As the subject male also attempts to rise, Officer ***** heard two gunshots from his right where his partner was standing. Officer ***** then stated "I'm Hit...I'm Hit". Fearing for his partner's safety, Officer ***** moved Officer ***** to a place of safety behind a parked auto. He told Officer ***** to stay down as he moved towards the subject who was now attempting to stand and move north on Carlton Avenue. Officer ***** again approached the male as responding units began to arrive. Officer ***** backed off, identified himself and informed other officers that the male might have a second gun, and to look for it. Officer ***** then asked for gloves so that he could complete the handcuffing of the male. This because he observed that the thumb of the male had been severely injured during the encounter. All involved were then transported to the hospital for treatment. Officer ***** stated that he had not drawn his weapon nor did he see his partner draw his weapon as they approached the male or during that encounter.

Based upon the initial investigation it appears that during the struggle with the subject, Police Officer ***** retrieved the Smith&Wesson .40 Caliber semi-automatic from the ground and had it in his possession. During this engagement Officer ***** discharged this weapon seven (7) times at the perpetrator, striking him multiple times. Subsequent to his discharge he then placed the firearm on the ground, then was rendered medical aid.

5. **DETECTIVES:**

Sgt. John McArdle, 77 Squad, responded to the scene and supervised a canvass for witnesses to this incident. This canvass produced one (1) witness to the police discharge. Det. Lantino is the investigating member. Case # 1107.

6. **S.A.T. COM., B.N.I.U.:**

Lieutenant Mark McGovern along with Sergeants James E. Murray and, Robert O'Hare assigned to the Brooklyn North Investigations Unit, responded to the scene and conducted a canvass for witnesses to this incident. This canvass produced no additional witnesses to the firearm discharge.

7.    **DISTRICT ATTORNEY:**

Assistant District Attorney Tamara Edelstein, assigned to the Kings County District Attorney's Office, did not respond to the 77 Precinct; however, she conducted the interview of one witness to the discharge when that witness was transported to her office at her request.

8.    **M.O.S. STATEMENTS-SUBJECT:**

Police Officer ***** was not interviewed at this time at the request of the Kings County District Attorney's Office.

9.    **M.O.S. STATEMENT-WITNESSES:**

The following Uniformed Member of the Service was interviewed under the provisions of Patrol Guide Procedure 206-13. His statements were electronically recorded and will be maintained on file at the S.A.T. COM., Brooklyn North Investigations Unit under Call Out # 03-49. His statements assisted in developing the account of events contained in paragraph four (4).

P.O. ***** *****, tax # *****

Officer ***** stated, in sum and substance, that he was on plainclothes patrol with Officer *****. He was driving in the vicinity of Carlton Avenue due to robbery pattern that had been identified in the area. At approximately 2400 hours, a radio transmission of a suspicious male in the vicinity of 198 St. Mark's Avenue, Carlton Avenue to Vanderbilt Avenue, was received. He drove to St. Mark's Avenue and encountered a male on the street. They identified themselves verbally as police officers and inquired as to what he was doing. He informed them that he had just left his residence. The male then continued on his way. Shortly thereafter, Officer ***** was driving north on Carlton Avenue from Bergen Street. He and Officer ***** then observed two males walking one behind the other, on the eastside of the street. The lead male reached the stoop of a brownstone on Carlton Avenue south of Dean Street and entered onto the property. The following male continued towards where the first male had turned to climb the stairway of the brownstone. It appeared to Officer ***** that the following male was about to possibly rob the first male. However, as they approached, the second male observed them and turned to continue north on Carlton Avenue. Officer ***** drove across Dean Street and stopped abreast of the male. After identifying himself and his partner as police officers, he asked the male what he was doing. The male said to him that he had already explained his actions to them shortly before. He asked the male his address to which he responded either 64 or 46 Classon Avenue. Officer ***** realized that that address was not anywhere near the vicinity of where they had originally encountered the male. With their suspicions heightened, Officer ***** exited the vehicle as his partner also exited. Officer ***** moved forward of a parked vehicle as Officer ***** passed to the rear. They both

approached the male to continue questioning him. As they approached, the male appeared to become defensive and backed away towards a nearby fence. As he was doing so he made movements with his hand towards his rear waistband. At that time the male said to them that he did not want to go back to jail. Officer *****, believing that the male was reaching for something, grabbed the male's right arm. Suddenly, what appeared to be a firearm fell to the ground from the rear waistband of the male. Officer ***** called out to Officer ***** "92", their signal for an immediate arrest. A struggle ensued with the male now reaching towards his front waistband. All three fell to the ground during the struggle. While Officer ***** was atop the male struggling with him, he hears more than one gunshot and felt the effect of the discharges. With that, he attempted to back off the male; and, in doing so, sees that his partner is also backing off the male. As the subject male also attempts to rise, Officer ***** heard two gunshots from his right where his partner was standing. Fearing for his partner's safety, Officer ***** moves Officer ***** to a place of safety behind a parked auto. He told Officer ***** to stay down as he moved towards the subject who was now attempting to stand and move north on Carlton Avenue. Officer ***** again engaged the male as responding units began to arrive. Officer ***** backed off, identified himself and informed other officers that the male might have a second gun, and to look for it. Officer ***** then asked for gloves so that he could complete the handcuffing of the male. This because he observed that the thumb of the male had been damaged during the encounter. All involved were then transported to the hospital for treatment. Officer ***** stated that he had not drawn his weapon nor did he see his partner draw his weapon as they approached the male or during that encounter.

10. **CIVILIAN SUBJECT INTERVIEWS-PERPETRATOR:**

The subject was not interviewed.

11. **CIVILIAN WITNESS INTERVIEWS:**

There is one (1) witness to this incident. His identity and statement is on file with the 77 Precinct Detective Squad.

The male witness stated that he was standing on the front steps of his residence when he observed the subject, a male, Black, walking north on Carlton Avenue, on the eastside. He heard that male say out loud, "Why they acting like they never seen someone like me." At that time, he observed an unmarked police car driving behind the subject. When the vehicle was just past Dean Street the occupants of the vehicle exited and approached the subject. They backed the subject against the wall whereupon the subject stated, "What's going on." One of the officers grabbed the subject by the neck and tried to take him to the ground. The second officer assisted the first. All three wound up on the ground with the officers saying, "Give me your hands." The subject stated, "I don't want to go back to jail." This exchange occurred three times. The officers continued to struggle with the subject when there was a

single shot. The subject got up and ran between the fence and the trees. One officer started firing 6-7 shots at the male who then fell to the ground. One of the officers then went to the other who had collapsed to the ground. One of the officers picked up a gun then put it down.

12. **PERPETRATORS HISTORY:**

Martin Diggs, M/B/30, DOB: 11/27/71, NYSID # 6149438J
06/08/88 – Robbery – 84 Pct.
07/09/88 – Robbery – MTS Pct.
07/1788  - Gr. Larc. – 88 Pct.
08/19/88 – Robbery – 88 Pct.
05/22/89 – CPW – 88 Pct.
09/13/89 – G.L.A. – 101 Pct.
11/29/89  - Robbery – 84 Pct.
10/20/93 – CPCS – 75 Pct.
01/21/94 – CPW – 75 Pct.
04/10/94 – CPW – 77 Pct.
05/23/96 – CPW – 75 Pct.
09/13/02 – CSCS – 88 Pct

09/22/95 – C.P. Marijuana – No. Carolina
03/03/00 – C. P. Firearm – No. Carolina

13. **M.O.S. DESCRIPTIONS:**

Police Officer *****, M/H/26
On Duty in plainclothes – Officer was wearing the Color of the Day - White
The officer was wearing Department authorized body armor.
Appointment: 7/16/99, Assigned: 2/23/00

14. **M.O.S. FIREARMS DISCRIPTION:**

A. Sgt. Sharkey, Tax # 918320, 77 Pct., inspected Officer *****'s firearm.
B. It is a Glock, 9mm, Model 19, S/N CTL617US
C. It contained fifteen (15) rounds of Department authorized ammunition in its magazine and one (1) round of Department authorized ammunition in the chamber.
D. Two additional magazines carried by Officer ***** were inspected and found to each contain fifteen (15) rounds of Department authorized ammunition.
E. Sgt. Murray, B.N.I.U., verified the weapon as being listed on the subjects Force Record Card.
F. The weapon was carried in an authorized holster.

42

    G. Officer \*\*\*\*\*'s service weapon was not secured. The subject's weapon, which was used by Officer \*\*\*\*\*, will be transported to the Firearms Analysis Unit by Crime Scene Unit personnel for testing.

    H. Officer Carrido was not carrying any additional firearm.

15.   **M.O.S. HISTORICAL DATA:**

    Not available at this time. The information will be supplied in the follow-up report of this investigation.

16.   **CRIME SCENE UNIT:**

    A. Sgt. Blozis, Shield #2033, Det. Wright, shield #6375 and Det. Henry, shield# 5153, and Det. Wallace, shield#3261 C.S.U., responded under run # 03-650.

    B. Evidence recovered:

    **a.** One (1) 9mm Ruger P-85, serial # 30189830 with one bullet hole with bullet lodged in upper backstrap.

    **b.** One (1) Smith&Wesson .40 cal model # SW40C, serial # PAK8956 containing one chambered live cartridge.

    **c.** Seven (7) discharged .40 caliber shells, S&W COR-BON Brass case with white primer

    **d.** Two (2) 9mm Luger PMC brass case white primer discharged shells

    **e.** One (1) biological sample and control sample recovered from firearm

    **f.** Two (2) fibers removed from perp's firearm

    **g.** One (1) piece deformed copper-jacket lead bullet recovered from bullet-resistant vest of P.O. Garrito

    **h.** Suspects clothing

    **i.** Point-Blank bullet-resistant vest, serial# 9900371483, lot# 0898A.

    C. A sketch of the scene was prepared by Det. Wright.

    D. The service weapons of both Officer Garrito and Officer \*\*\*\*\* were examined. The weapons contained authorized department ammunition.

17.   **EMERGENCY SERVICES UNIT:**

    A. P.O. Condon and P.O. Formica, Truck # 8A responded and conducted a search of the crime scene.

    B. Capt. Johnson, SATCOM Duty Captain, supervised the search.

    C. The search resulted in the recovery of ballistic evidence.

    D. Sergeant Merluin, 77 Precinct supervised a daylight search conducted by Emergency Service Unit with no additional evidence recovered.

18. **FIREARMS ANALYSIS UNIT:**

    A.  P.O. Fitzgerald, F.A.U., was notified
    B.  Officer *****'s service firearm will not be delivered to F.A.U. by B.N.I.U.

19. **TRAUMA UNIT:**

    A.  Lt. Matili, Medical Division, was notified.
    B.  Officer ***** and Officer ***** were advised of the availability of counseling services both through this department and their line organization.
    C.  The Trauma Response Unit did not respond to the 77 Precinct.

20. **BOROUGH ASSIGNMENT:**

    Officer ***** will be assigned to administrative duties at SATCOM Brooklyn North Operations for a minimum of his next three tours.

21. **COMMUNITY AFFAIRS:**

    Sgt. Sharkey, 77 Precinct, conducted a canvass of the area and found no community unrest as a result of this incident.

22. **REPORTS PREPARED:**

| | | |
|---|---|---|
| OLCS # | 64070 | Assault 1 |
| OLCS # | 64071 | Assault 2 |
| OLCS # | 64072 | Investigate Shots Fired |
| Voucher # | L856501 | Ballistics |
| Voucher # | L856502 | Clothing |
| Voucher # | L856503 | Clothing |
| Voucher # | L856504 | Gun |
| Voucher # | L856505 | Narcotics |
| OLBS # | K03636276 | |

23. **MEDICAL INFORMATION:**

    A.  P.O. ***** was removed to Kings County Hospital for treatment of gunshot injuries and blunt trauma. Treated by Dr. Kurtz and admitted in stable condition.

    P.O.***** was transported to Kings County Hospital for treatment of non-gunshot injuries to his hands. He was treated and released by Dr. Kurtz.

B.    N/A

C.    . Martin Diggs was removed by EMS to Brookdale Hospital where he was treated for gunshot wounds by Dr. Wadrendpy and admitted in critical condition.

24.    **RADIO RUN INFORMATION:**

Sgt. O'Hare, B.N.I.U., prepared a request for taped copies of all 911 and radio transmissions relative to this incident. SPRINT # X00137, X00168, and X00170. These radio transmissions were reviewed for content and substance, and correlate to the events as described by the involved officers.

25.    **MISCELLANEOUS:**

The following weapons were recovered from the scene:

S&W, .40 caliber, Model 40 C semi-automatic pistol, S/N PAK8956.
The weapon, upon inspection, contained one (1) round in the chamber and none in the magazine. The weapon is capable of the following load: one (1) in the chamber and ten (10) in the magazine.

Ruger, 9mm, Model P-85, semi-automatic pistol, S/N 30189830.
At this time, it has been deemed unsafe to inspect this weapon for its state of load, due to its being struck by a round in the grip. It will be delivered intact to the Firearms Analysis Unit for further analysis.

Officer ***** was directed to contact the Outdoor Range and arrange to attend the next Firearms Tactics Review session.

P.O. ***** sustained blunt trauma to his chest, the bullet having penetrated three layers of his vest, and a gunshot injury to his right foot causing a fracture. As of the writing of this report, the bullet lodged in the foot of Officer ***** has not been removed.

P.O. ***** sustained swelling and abrasions to both his hands. Additional medical tests are scheduled to determine if PO ***** suffered a fractured right hand.

Martin Diggs, subject, sustained gunshot wounds to his right rear leg, his right rear flank, his right thumb and right foot. There was an additional bullet wound to the stomach area of Martin Diggs, however, as per Dr. Wadrendpy it cannot be determined if this wound was sustained during this incident or on a previous date.

A search of Martin Diggs' vouchered clothing by Crime Scene Unit personnel revealed 2 small bags of marijuana beneath the clothing, 1 plastic bag containing 22 smaller bags of marijuana recovered from his jacket, and one additional bag containing a quantity of alleged marijuana in his jacket pocket.

Captain Monahan inspected the weapons and additional magazines of both Officer ***** and Officer *****. All weapons were found to be properly loaded with authorized ammunition. Additionally, due to the unusual nature of the events in this firearms discharge, the weapons of all responding officers were examined for evidence of recent discharge with negative results.

26. **NOTIFIED:**

| | |
|---|---|
| Sgt. Accurso | D.C.P.I. |
| Det.Hogan | I.A.B., Log # 03/11987 |
| P.O. Stagnitta | Operations, FD# 45 |
| P.O. Cornetta | SATCOM Wheel, Log# 1009 |

27. **PRESENT:**

| | |
|---|---|
| Hon. Michael Bloomberg | Mayor |
| Hon. Raymond W. Kelly | Police Commissioner |
| Dep. Comm. Michael O'Looney | D.C.P.I. |
| Chief Joseph J. Espositio | Chief of Department |
| Chief Nicholas Estavillo | Chief of Patrol |
| A.C. Joseph F.X. Cunneen | C.O., SATCOM B. N. |
| D.C. Albert W. Girimonte | X.O., SATCOM B. N. |
| D.C. Joellen F. Kunkel | Duty Chief |
| D.C. Michael O'Neil | C.O. Employee Relations |
| Insp. Steven Silks | C.O., F.A.U. |
| Insp. Coan | D.C.P.I. |
| Insp. Michael Gabriel | SATCOM B.N., Det. Ops. |
| Insp. Denis McCarthy | C.O., F.I.D. |
| Insp. James T. O'Brien | SATCOM Counter Terrorism |
| D.I. James O'Connell | C.O., 77 Precinct |
| D.I. Edward Mullen | PBBS Duty Inspector |
| D.I. Michael Muscatello | Duty Inspector |
| D.I. Brian O'Neil | I.A.B., Group 9 |
| Capt. Timothy J. Trainor | C.O., SATCOM B.N.I.U. |
| Capt. Kristel A. Johnson | Duty Captain |
| Capt. Patrick McAndrews | SATCOM B.N. |
| Capt. Gary Gomula | C.O., Crime Scene Unit |
| Capt. Ignatius LaBarbera | SATCOM B.N. |
| Capt. John Corbisiero | X.O., 90 Precinct |
| Capt. Christopher Monahan | X.O., 75 Precinct |
| Capt. James Klein | C.O., D.C.P.I. |
| Capt. Charles P. Neacy | SATCOM B.N. Det. Ops. |
| Capt. Casto Zona | SATCOM B.N. Det. Ops. |

| | |
|---|---|
| Capt. Paullick | PBBS Duty Captain |
| Capt. Novak | X.O., 71 Precinct |
| Capt. Probeck | P.B.B.S. |
| Lt. Joseph Alagna | Chief of Department |
| Lt. John Lewis | 67 Precinct |
| Lt. Thomas Reiley | Brooklyn Robbery |
| Lt. Thomas Panetta | Group 54 |
| Sgt. Sharkey | 77 Anti-Crime |
| Sgt. DeCandia | E.S.U. Citywide Supv. |
| P.O. Patrick Lynch | P.B.A. |
| Pat Lanza | Mayor's Office |

28.    **RECOMMENDATION:**

The investigation of this incident is ongoing pending the outcome of Officer *****'s interview under P.G. 206-13. However, based upon the preliminary investigation conducted by the undersigned it is believed that Officer ***** gained control of the S&W .40 caliber pistol originally possessed by the subject which had fallen from his rear waistband, and used that weapon to stem the attack of the subject upon him.


Timothy J. Trainor
Captain

**DISTRIBUTION:**
Deputy Commissioner Strategic Initiatives
Chief of Department
Chief of Department Firearms Discharge Review Board (2 Copies)
Chief of Patrol
Chief of I.A.B.
Chief of Personnel
C.O., SATCOM Brooklyn North
C.O., SATCOM Brooklyn North Patrol Operations
C.O., I.A.B.
C.O., D.C.P.I.
C.O., F.I.D.
C.O., Firearms and Tactics Section
C.O., Medical Division
C.O., Personnel Safety Desk
C.O., 77 Precinct
C.O., SATCOM BNIU


**ATTACHMENTS:**
SPRINT Report
Crime Scene Sketch

47

# EXHIBIT K

**PRESS RELEASE**


**NO. 2007-022**
**Friday, June 18, 2007**

### COMMISSIONER KELLY ANNOUNCES UNDERCOVER PANEL RECOMMENDATIONS: MANDATORY ALCOHOL TESTING IN SHOOTINGS WITH FATALITIES OR INJURIES

Police Commissioner Raymond W. Kelly announced today 19 recommendations of a special panel that he appointed to review New York City Police Department undercover procedures in the wake of the Sean Bell shooting.

The recommendations include mandatory breathalyzer tests of all police officers, on duty or off duty, whose firearm discharge results in injury or death. They also include recommendations to improve how undercover officers are recruited, trained, supervised, and retained.

Commissioner Kelly notified the Department's executive command staff of the recommendations today and directed them to devise implementation plans or to identify any challenges or barriers to implementation.

It is anticipated that the administration of breathalyzer tests will begin in September.

"I want to thank the members of the committee for all of the time they donated to this important undertaking. It has resulted in a comprehensive set of thoughtful recommendations to make police undercover operations safer, more effective, and better understood by the public, while improving recruitment, training, supervision, retention and accountability," Commissioner Kelly said.

"There is no more dangerous assignment in policing than undercover work," Commissioner Kelly said. "We're indebted to the committee for making it possible for the Police Department to go forward better prepared to make undercover operations the safest possible for the police and public alike."

The Deputy Commissioner, Legal Matters, has addressed the legal issues involved in implementing the proposed alcohol testing policy and has concluded that such a policy would be constitutional. While there is a currently pending court case involving the Department's authority to use hair samples to test for drug usage, the DCLM has concluded that the proposed new alcohol testing policy does not have to be collectively bargained, and, in addition, members should be trained and coached on methods of limiting and avoiding alcohol consumption during undercover operations.

The committee will continue to meet to address any other issues that may arise as implementation moves forward.

The Committee for the Review of Undercover Procedures is chaired by Chief of Internal Affairs Charles Campisi. The other members include: Deputy Commissioner Dr. Cedric Alexander of the New York State Division of Criminal Justice Services; Deputy Commissioner of Training Charles DeRienzo; Deputy Commissioner of Legal Matters Commissioner S. Andrew Schaffer; Deputy Commissioner of Strategic Initiatives Michael J. Farrell; Deputy Commissioner of Intelligence David Cohen; Chief of Personnel Rafael Pinero; Chief of Community Affairs Douglas Ziegler; and Chief of Organized Crime Control Anthony Izzo.

Recommendations:

1    Develop methods for the psychological screening of candidates for undercover assignments

2    Provide periodic psychological screening and counseling for active undercover officers whose assignments are the most stressful in the Department and provide training for managing stress

3    Enhance scenario based training for undercovers through the use of professional actors

4    Expand the pool of potential undercovers by accepting particularly suitable candidates with less than 2 years of service and provide training tailored to their needs

5    Develop specific training for supervisors who oversee undercover operations with an emphasis on management, leadership, communication and interpersonal skills

6    Conduct a formal job analysis of the undercover assignments in order to establish a more effective performance evaluation system

7    Develop a community outreach program that educates the public about the risks, challenges and necessity of undercover operations

8    Develop a training video for officers involved in undercover operations which includes the perspectives of community leaders from the areas where operations are most often undertaken

9    Require tactical plans for undercover operations to include relevant information about the neighborhood in which the operation will take place

10  Require the administration of a Breathalyzer test in all cases in which a member of the service is involved in a firearms discharge incident, on duty or off duty, which results in injury or death

11  Clarify Department procedures regarding the consumption of alcohol by undercover officers during operations to limit such consumption to two drinks per tour and provide training on credible ways to avoid drinking altogether when pressured to do so by subjects

12  Develop a management accountability mechanism tailored to access the performance of supervisors who oversee undercover operations

13  Require the Investigations Units of the relevant Bureaus to conduct periodic inspections of tactical meetings to assess their adequacy and completeness

14  Establish a mechanism for assuring the completion of required annual firearms training by undercover officers, while assuring the security of their identities

15  Design a standard, readily identifiable, highly reflective jacket for officers use when involved in plainclothes operations

16  Provide supervisors of undercover operations with portable megaphones and install light packages and public address systems in unmarked Department vehicles so as to enhance the awareness of police presence during enforcement actions

17  Require the inspection of all members of undercover operations, prior to deployment, to assure that all required equipment is being carried and is in good working order

18  Modify the tactical plan template to include specific consideration of the placement of marked police vehicles near the set to be deployed as needed, depending on the characteristics of the site

19  Develop incentives to retain experienced and highly competent undercover officers

07 Civ. 9246 (GBD)(MHD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL J. PALLADINO, as President of the
New York City Detectives' Endowment
Association, Inc., et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**DEFENDANTS' NOTICE OF MOTION**

**MICHAEL A. CARDOZO**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-187
New York, N.Y.  10007-2601

Of Counsel:  Alan M. Schlesinger
Tel:  (212) 788-0952

Matter No. 2007-031620

*Due and timely service is hereby admitted.*

New York, N.Y.  ........................................., 200 . . .

...........................................................................

Attorney for.................................................................