UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PATRICK J. LYNCH, as President of the PATROLMEN'S BENEVOLENT ASSOCIATION of the CITY OF NEW YORK, INC. and the PATROLMEN'S BENEVOLENT ASSOCIATION of the CITY OF NEW YORK, INC., | ) ) ) ) ) ) ) | 07 Civ.9337 (GBD) ECF |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| The CITY OF NEW YORK, the NEW YORK CITY POLICE DEPARTMENT, and RAYMOND W. KELLY, as COMMISSIONER of the NEW YORK CITY POLICE DEPARTMENT, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Lawrence S. Robbins (LR-8917)
Donald J. Russell
Alison C. Barnes
Brian A. Pérez-Daple
ROBBINS, RUSSELL, ENGLERT, ORSECK,
    UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

Thomas P. Puccio
LAW OFFICES OF THOMAS P.
    PUCCIO
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

OF COUNSEL:

Michael T. Murray
Office of the General Counsel of
the Patrolmen's Benevolent
Association of the City
of New York
40 Fulton St.
New York, New York 10038-1850
Telephone: (212) 775-4500

Dated: November 16, 2007                    *Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... i

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ........................................................................................................................... 2

I.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ............................ 2

   A.   Because Alcohol Testing Under IO 52 Is Part Of A Criminal Investigation, It Does Not Fall Within The "Special Needs" Exception Of The Fourth Amendment, And Therefore May Not Be Conducted Without A Showing Of Individualized Suspicion ........................................................ 3

   B.   Assuming For Argument's Sake That IO 52 *Is* Justified By "Special Needs," The Balance Of Governmental Interest And Private Intrusion Does Not Pass Muster Under The Fourth Amendment ............................................. 9

      1.   The private intrusion is substantial ................................................................. 9

      2.   The governmental interests are overstated .................................................... 10

II.  THE COMPLAINT SHOULD NOT BE DISMISSED, AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ................................. 13

CONCLUSION ..................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Able* v. *United States*, 44 F.3d 128 (2d Cir. 1995) ........................................................................ 2

*City of Indianapolis* v. *Edmond*, 531 U.S. 32 (2000) ..................................................... 3, 13, 14, 15

*Erickson* v. *Pardus*, 127 S. Ct. 2197 (2007) ............................................................................. 14

*Ferguson* v. *Charleston*, 532 U.S. 67 (2001) ...................................................................... 5, 6, 7

*Haitian Centers Council, Inc.* v. *McNary*, 969 F.2d 1326 (2d Cir. 1992) ...................................... 2

*Jackson Nat'l Life Ins. Co.* v. *Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994) ......................... 14

*National Treas. Employees Union* v. *von Raab*, 489 U.S. 656 (1989) ........................... 3, 4, 11, 12

*Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ....................................... 1, 4, 8

*Time Warner Cable of New York City* v. *Bloomberg*, 118 F.3d 917 (2d Cir. 1997) ..................... 2

*Tom Doherty Associates, Inc.* v. *Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995) .............. 2

*United States* v. *Amerson*, 483 F.3d 73 (2d Cir. 2007) .......................................................... 3, 7, 8

*United States* v. *Lifshitz*, 369 F.3d 173 (2d Cir. 2004) ............................................................... 7

*Wyman* v. *James*, 400 U.S. 309 (1971) .................................................................................... 11

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 13

## PRELIMINARY STATEMENT

Defendants (collectively, "the City") have now conceded every point necessary for the entry of an order enjoining the enforcement of alcohol testing under Interim Order 52 ("IO 52"):

- Charles V. Campisi, Chief of the Internal Affairs Bureau, in his declaration submitted by the City, acknowledges, point blank, that "*the NYPD treats all firearms discharges as an investigation into a possibly criminal matter*." Campisi Decl. ¶ 33 (emphasis added). As we show below, that concession, without more, demonstrates that IO 52 is *not* justified by "special needs" that permit the government to conduct a search without individualized suspicion. On that basis alone, IO 52 should be enjoined as unconstitutional.

- The City acknowledges, as it must, that there is utterly no empirical connection between alcohol abuse and police shootings. City Br. 20. Lacking the kind of empirical grounding that persuaded the Supreme Court in *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), the City cannot possibly sustain its claim that IO 52 is necessary to promote the "integrity" of police officers. Accordingly, assuming, arguendo, that the City is entitled to defend IO 52 by "balancing" governmental interests against the intrusion on privacy, the balance strongly favors Plaintiffs.

- Bereft of anything more persuasive to say, the City also asks this Court to sustain IO 52 on the remarkable ground that suspicionless alcohol testing is needed to dispel "rumors" that police officers who discharge firearms may have done so because of alcohol abuse. City Br. 23. To state such an argument is to refute it. The Fourth Amendment should not be diluted simply to quell "rumors" that lack the thinnest empirical foundation.

For all of these reasons, as well as those stated in our moving papers, this Court should enter an order preliminarily enjoining IO 52 and denying the City's motion to dismiss or, in the alternative, for summary judgment.

**ARGUMENT**

**I.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION**

The City does not dispute that IO 52 poses "irreparable injury" to the Plaintiffs. Its only claim is that Plaintiffs have failed to show either "a likelihood of success on the merits" or "sufficiently serious questions going to the merits making them a fair ground for litigation, and the balance of hardships tips decidedly in plaintiffs' favor." City Br. 21.[1]  But the City's arguments are flawed at every turn. The City misconceives the so-called "special needs" doctrine, which is a narrow exception from the principle that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of

---

[1]   The City is incorrect when it asserts (City Br. 21) that a party must establish a likelihood of success on the merits, and not just serious questions and a balance of hardships, when "seek[ing] to enjoin government action."  That statement is affirmatively *refuted* by the only case cited by the City.  See *Time Warner Cable of New York City* v. *Bloomberg*, 118 F.3d 917, 924 (2d Cir. 1997) ("We conclude that the lower [serious questions] preliminary injunction standard would be applicable to this litigation.").  The likelihood of success standard is required *only* to enjoin government action taken "*pursuant to a statutory or regulatory scheme,*" because policies developed through "presumptively reasoned democratic processes * * * should not be enjoined lightly." *Able* v. *United States*, 44 F.3d 128, 131 (2d Cir. 1995) (emphasis added and citation and quotation omitted).  The higher standard is not required for "policy formulated solely by the executive branch." *Ibid.*, discussing *Haitian Centers Council, Inc.* v. *McNary*, 969 F.2d 1326 (2d Cir. 1992).  The policy challenged in this case was not mandated by statute or developed through a deliberative notice-and-comment regulatory procedure; it was a policy adopted by the decision of a single executive branch official.  See Campisi Decl. Ex. K ("Commissioner Kelly notified the Department's executive command staff * * * to devise implementation plans.")  Therefore, Plaintiffs are not required to demonstrate a likelihood of success on the merits.

The City is also incorrect when it claims that a higher standard is required if "the preliminary relief sought is identical to the ultimate relief sought." City Br. 22. A higher standard is required only if, in addition, the preliminary injunction, "once complied with, cannot be undone." *Tom Doherty Associates, Inc.* v. *Saban Entertainment, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995). Plaintiffs here seek only a prohibitory injunction to preserve the status quo – to prohibit the implementation of a new alcohol testing policy that alters the status quo by requiring alcohol testing under circumstances where, absent the new policy, tests would not be conducted.

2

wrongdoing." *City of Indianapolis* v. *Edmond*, 531 U.S. 32, 37 (2000).  As the City itself concedes, IO 52 treats every alcohol test as an intrinsic part of a criminal investigation.  That fact alone takes IO 52 outside the narrow class of "special needs" in which the government is free to dispense with a showing of individualized suspicion.  Finally, even if the City could establish that IO 52 fits within the "special need" category (it can't and it hasn't), the balance of private intrusion and governmental interest does not justify the suspicionless alcohol testing of every police officer involved in a shooting that results in injury or death.  IO 52 is therefore unconstitutional, and a preliminary injunction should issue.

> **A. Because Alcohol Testing Under IO 52 Is Part Of A Criminal Investigation, It Does Not Fall Within The "Special Needs" Exception Of The Fourth Amendment, And Therefore May Not Be Conducted Without A Showing Of Individualized Suspicion**

As the Second Circuit explained earlier this year, "suspicionless searches . . . are highly disfavored since they dispense with the traditional rule that a search, if it is to be deemed reasonable, must either be supported by a warrant based on probable cause, or justified by evidence establishing individualized suspicion of criminal misconduct." *United States* v. *Amerson*, 483 F.3d 73, 77-78 (2d Cir. 2007).  To be sure, there are cases "where a Fourth Amendment intrusion serves special governmental needs, *beyond the normal need for law enforcement*."  *National Treas. Employees Union* v. *von Raab*, 489 U.S. 656, 665 (1989) (emphasis added).  In this narrow class of cases – and *only* in this narrow class of cases – "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  *Id*. at 665-66.

3

The City contends that IO 52 fits within the class of "special needs" and that it is therefore free to dispense with a showing of particularized suspicion. But the City overlooks the defining feature of "special needs" cases – the intrusion must be based on a justification that is "beyond the normal need for law enforcement." *von Raab*, 489 U.S. at 665. Thus, for example, in *von Raab*, it was "clear that the Customs Service's drug-testing program [was] not designed to serve the ordinary needs of law enforcement" because "[t]est results may not be used in a criminal prosecution of the employee without the employee's consent." 489 U.S. at 666. Similarly, in *Skinner*, the Court concluded that the FRA drug and alcohol testing program was constitutional without individualized suspicion where "the record [did] not disclose that it was intended to be, or actually has been * * * used" to "authorize the release of biological samples to law enforcement authorities." 489 U.S. at 621 n.5.

But as the City candidly admits, alcohol testing under IO 52 *is* an intrinsic part of the criminal investigation that *invariably* attends a police shooting. Chief Campisi has conceded this, point blank, in the declaration submitted by the City (Campisi Decl. ¶ 33) (emphasis added):

> [*All*] *shootings are treated as part of a possible criminal investigation* in recognition of the fact that criminal charges may result against the NYPD officer or a civilian involved in the shooting incident. Of course, whether criminal charges against anyone will result cannot be determined until the investigation is completed and that is why *the NYPD treats all firearms discharges as an investigation into a possibly criminal matter*. Therefore, the Crime Scene Unit often responds to the scene of a shooting.

Chief Campisi could hardly have said otherwise – from the moment a police officers discharges his weapon, he is subject to a full-fledged criminal inquiry: "[f]ollowing the discharge of a firearm, a variety of superior officers and investigators

4

will respond to the scene of the shooting, regardless of whether the shooting is on or off duty and regardless of whether an injury has resulted from the shooting. Those responding will almost always include the Patrol Borough's 'Shooting Team Leader' who is a Captain or above and who leads the initial investigation of any shooting." Campisi Decl. ¶ 27. A Patrol Supervisor will also be present to "[e]stablish crime scene, if necessary." *Id*., Ex. H at 2. If an injury is involved, the Internal Affairs Bureau, which is charged with "investigating possible corruption, criminality and serious misconduct among NYPD officers" (Campisi Decl. ¶ 2) must be notified immediately. *Id*., Ex. H at 2. And in "all shooting cases," the "office of the District Attorney for the area in which the shooting occurred will be notified and that office may decide to have personnel respond to the shooting." *Id*. at 3; Campisi Decl. ¶ 30. Evidence will be secured for possible use at trial: "The officer or officers who fired their weapons will have those weapons examined and inspected. For example, the number of live and spent shells will be recorded. The ammunition possessed by the officer will be taken for safekeeping." *Id*. ¶ 36.

Alcohol testing under IO 52 is simply another step in what the City concedes to be a criminal investigation. As Chief Campisi states, "The results of the alcohol testing may result in discipline of the officer who has been involved in a shooting while under the influence of alcohol. The results may also be used in the criminal investigation of the shooting." Campisi Decl. ¶ 66.

In short, far from being "divorced from the State's general interest in law enforcement" (*Ferguson* v. *Charleston*, 532 U.S. 67, 79 (2001)), alcohol testing under IO 52 is an inextricable part of the City's routine investigation of potential criminal conduct

5

at the scene of every police shooting. However laudatory these law enforcement goals may be, the City – like any other governmental actor – must have, at the very least, individualized suspicion when it conducts such a criminal investigation.

The City labors under two fundamental misconceptions about the "special needs" doctrine. First and foremost, it believes that so long as it can articulate an *additional* rationale for alcohol testing – separate and apart from law enforcement – it can justify the resulting search and seizure on "special needs" grounds. That is not so. To be sure, a search whose dominant purpose is "divorced" from law enforcement may be justified by "special needs," even if the results of the search turn out to have an incidental value to law enforcement. But where, as here, the search is *designed* to serve law enforcement needs from start to finish, it cannot be a "special needs" search simply because it *also* serves a *non*-law enforcement goal. That is the very point of the Supreme Court's decision in *Ferguson*. That case involved a Fourth Amendment challenge to a Charleston, South Carolina policy under which pregnant patients were tested for cocaine abuse and informed that positive test results would be sent to law enforcement authorities. The City and hospital officials claimed that this policy fell within the "special needs" category because "their ultimate purpose – namely, protecting the health of both mother and child – is a beneficent one." 532 U.S. at 81. The Supreme Court held otherwise. It is one thing, the Court explained, when "physicians or psychologists, in the course of ordinary medical procedures aimed at helping the patient herself, come across information that under rules of law or ethics is subject to reporting" to the police. *Id*. at 80-81. But it is quite another to routinely gather evidence that is then made available to law enforcement officials. "The fact that positive test results were turned over to the

6

police does not merely provide a basis for distinguishing our prior cases applying the 'special needs' balancing approach to the determination of drug use. It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." *Id* at 84.

The Second Circuit made the same point in *Amerson*, a case involving the constitutionality of DNA sampling under the 2004 DNA Act. Because the statute required taking DNA samples from all convicted felons without individualized suspicion, the court of appeals first asked whether the statute was justified by a "special need," and held that it was. DNA samples from convicted felons, the court observed, "provide no evidence in and of themselves of criminal wrongdoing, and are not sought for the investigation of a specific crime." 483 F.3d at 81. "The taking of DNA samples, unlike a normal law enforcement investigation, does not involve *any suggestion* that the individual is being suspected of having committed a crime (other than the one of which he had already been convicted." *Id*. at 82 (emphasis added). Accordingly, the Second Circuit concluded, "the state's purpose in conducting DNA indexing is distinct from the ordinary crime detection activities associated with normal law-enforcement concerns." *Id*. at 81. As the Second Circuit summarized the test in *United States* v. *Lifshitz*, 369 F.3d 173, 185 (2d Cir. 2004), "the 'special need' must not be isomorphic with law enforcement needs, but rather go beyond them."

Because alcohol testing under IO 52 is entirely "isomorphic with law enforcement needs" – because it is, in fact, joined at the hip with law enforcement – the City must show individualized suspicion before it may proceed. IO 52 imposes no such requirement, and it is therefore unconstitutional without regard to whether the governmental interests outweigh the private intrusion.

7

And that raises the second fallacy in the City's position.  The City seems to believe that, if the balance of interests tips in the government's favor, then IO 52 falls within the category of "special needs."  But that is mistaken.  Courts do not engage in a balancing inquiry to determine *whether* to find a "special needs" exception; the balancing inquiry is undertaken only if the court *has already determined that the challenged search falls within the "special needs" category*.  Only if "special needs" *beyond* ordinary law enforcement justify the search is the government entitled to invoke a balancing test to supplant the "ordinary" requirement of probable cause and a warrant, or at the very least individualized suspicion.  See *Skinner*, 489 U.S. at 619 ("*When faced with special needs*, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context" (emphasis added)); *Amerson*, 483 F.3d at 79 n.6 (the special needs test is "more stringent" than the general balancing test; balancing test is the second inquiry, if the government shows first that the search is justified by a special need beyond normal law enforcement).

By the City's own admission IO 52 serves ordinary law enforcement interests, even if it (arguably) serves other purposes as well.  That is the end of the matter.  Because IO 52 falls outside the "special needs" category, it cannot be enforced without a showing of individualized suspicion.  There is no such requirement.  The Interim Order should therefore be enjoined as unconstitutional.

>   B.  Assuming For Argument's Sake That IO 52 *Is* Justified By "Special Needs," The Balance Of Governmental Interest And Private Intrusion Does Not Pass Muster Under The Fourth Amendment

Although we do not believe that balancing is appropriate at all in this case, it must be added that the City has understated the degree of private intrusion and substantially overstated the strength of the governmental interest at stake. A fair evaluation of the competing interests reveals IO 52 to be plainly unreasonable under the Fourth Amendment.

>   1.  The private intrusion is substantial

The City argues at length that police officers "have diminished expectations of privacy," and that IO 52 effects only a modest additional intrusion. City Br. 7. But the City understates the actual intrusiveness of the alcohol testing. As we explained in our opening brief (at 11) – and as the City fails to dispute – IO 52 requires police officers to submit to alcohol testing in the immediate aftermath of a shooting involving injury or death. IO 52 thereby treats police officers like crime suspects at the worst possible time – when they may well be experiencing physical injury, psychological trauma, or both. And the overlay of potential discipline or criminal charges only magnifies the degree of intrusiveness.

The City contends that police officers have a particularly diminished expectation of privacy in the aftermath of a shooting. As the City points out, immediately following any firearm discharge an officer will be joined at the scene by a "Shooting Team Leader"; a "crime scene unit"; "[c]ommunity affairs officers"; a Patrol Borough officer, and in all likelihood, one or more lawyers from the "District Attorney's office." City Br. 9-10. These officials are highly trained to detect the presence of alcohol on the scene; it

9

is therefore surpassingly hard to see why the presence of all these experts justifies *dispensing* with individualized suspicion before conducting a search and seizure.

### 2. The governmental interests are overstated

Conversely, the City vastly overstates the governmental interests (other than simple law enforcement) at stake. In truth, IO 52 rests on the flimsiest of pretexts.

1. First and foremost, the City's vaunted "integrity" rationale is belied by the wholesale absence of *any* empirical connection between police shootings and alcohol abuse. Indeed, the City acknowledges that, whereas "in *Skinner* there was a history of alcohol abuse" that prompted the Federal Railroad Administration to promulgate its drug and alcohol testing program, here "there is no history of alcohol involvement in shootings other than suicides." City Br. 20. That is reason enough to disregard the City's "integrity" justification for a suspicionless search.

In an effort to paper over this telling deficiency, the City marshals a motley array of other statistics. None of them advances the City's position. For example, Chief Campisi reports that, from 2005 to the present, some 38 off-duty police officers were arrested for Driving While Intoxicated. Campisi Decl. ¶ 21. But as the City elsewhere notes, "[t]here are approximately 35,000 NYPD officers" (City Br. 16); the fact that about 0.1% of the police force, while *off-duty*, has been charged with DWI scarcely suggests an "integrity" problem at all, much less one that warrants dispensing with the protections of the Fourth Amendment.

Chief Campisi also points to 10 suicides from 2005 to the present, noting that four of those involved "either alcohol present at the scene or a medical examiner's report [that] found alcohol in the body of the deceased officer." Capisi Decl. ¶ 22. These data

10

are even further afield. The fact that 0.01% of the police force has committed suicide with a suggestion of alcohol involvement confirms how *little,* not how much*,* IO 52 is needed. There simply is no alcohol "integrity" problem that needs solving.

No more persuasive are the data submitted by Det. Suzanne Gimblet, an Alcohol and Substance Abuse Counselor. She reports in her declaration that, from 2005 to the present, the Counseling Unit conducted some 600 interviews with officers who either voluntarily, or at the request of a supervisor, came in for interviews regarding possible alcohol problems. The fact that police officers have voluntarily come in to talk, or have been required to do so by a supervisor, would appear to *undercut*, not support, the need for a system of suspicionless searches and seizures.

The City does not pretend that there is any support for "a relationship between shootings and alcohol." City Br. 16. In the City's view, however, the Supreme Court's decision in *von Raab* supports suspicionless alcohol testing despite the absence of such empirical support. But *von Raab* is cold comfort indeed. Crucial to the Court's 5-4 holding in *von Raab* was the fact that the Customs drug-testing procedures "significantly minimize[d] the program's intrusion on privacy matters" because "[o]nly employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions." 489 U.S. at 672 n.2. Because Customs Officers knew of the testing in advance, and therefore effectively consented to it, the Court analogized (*id*.) the Customs testing to the Fourth Amendment claim in *Wyman* v. *James*, 400 U.S. 309 (1971). There, the Supreme Court had held that the fact that a welfare recipient was

11

given "advance notice that she would be visited by a welfare case worker minimized the intrusion on privacy occasioned by the visit." 489 U.S. at 672 n.2

The present case is sharply different. A police officer obviously has no "advance notice" of a shooting, and therefore has no way of anticipating, and thus consenting to, the alcohol test. Whereas the Customs Officers in *von Raab* were subjected to testing only when they sought certain specific promotions, Plaintiffs are subjected to alcohol tests whenever fate breaks the wrong way.

In short, the City's "integrity" rationale is a fig leaf. Devoid of both the empirical record relied on in *Skinner*, and the essential voluntariness of the Customs program in *von Raab*, IO 52 is little more than routine law enforcement masquerading as "good government." IO 52 is the very kind of program about which Justice Scalia warned in his *von Raab* dissent: "a kind of immolation of privacy and human dignity in symbolic opposition to [alcohol] use." 489 U.S. 681 (Scalia, J., dissenting).

2. Although IO 52, by its terms, identifies only the "integrity" rationale as a "purpose" for alcohol testing, Chief Campisi cobbles together several other putative justifications in his declaration. These include "protecting the safety of the public and NYPD officers"; "deterring alcohol intoxication by NYPD officers who are carrying firearms"; and "assuring the public that one of the most important and daunting powers of the police, the power to apply deadly fore when necessary, is not being abused or used by officers who are under the influence of alcohol." Campisi Decl. ¶ 70. These are all makeweight, concocted after the fact, and have no greater force than the "integrity" rationale actually advanced in IO 52. In the absence of *any* empirical connection between alcohol abuse and police shootings, these goals, however noble in theory, cannot

12

justify suspending the principle that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 37.

    3.    All of which brings us to the most disturbing feature of IO 52 – its *origins.* As the City recounts late in its brief (at 23 (emphasis added)), "[f]ollowing the tragic shooting of Sean Bell and his two companions there were *rumors* that the [sic] one or more officers were under the influence of alcohol at the time of the shooting." Rumors? Is the City really asking this Court to accept "rumors" as a sufficient basis for dispensing with the traditional requirement of individualized suspicion under the Fourth Amendment?

Lying only slightly beneath the veneer of this cynical argument is the suggestion that the constitutional rights of police officers may be diluted to placate public opinion. That is a truly disgraceful rationale. Constitutional rights should not be sacrificed to diffuse speculation worthy of Page 6 of the *New York Post*. This Court should enjoin IO 52 as a palpable violation of the Fourth Amendment.

    **II.    THE COMPLAINT SHOULD NOT BE DISMISSED, AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED**

The City asks this Court to dismiss the complaint or, in the alternative, to grant summary judgment in the City's favor. With respect to the first remedy, the City does not even identify the governing standard under FED. R. CIV. P. 12(b)(6), much less identify anything that is lacking in the complaint. Suffice it to say, the Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it

13

rests." *Erickson* v. *Pardus*, 127 S. Ct. 2197, 2200 (U.S. June 4, 2007). On a motion to dismiss, the court must accept as true the plaintiff's allegations, *id.*, "and draw[] all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. Co.* v. *Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994). The complaint in this case easily meets that standard.

The City's motion for summary judgment is also unsupported and unsupportable. See Pl. Rule 56.1 Statement.[2] For the reasons stated above, the City's own admissions demonstrate that IO 52 does not fall within the "special needs" category and, for that reason alone, should be struck down under the Fourth Amendment. What is more, even if a balancing of interests were appropriate, the City's admissions show that the balance tilts sharply in Plaintiffs' favor. For that reason as well, the Fourth Amendment cannot abide the suspicionless alcohol testing of police officers involved in shooting incidents. The City's admissions, alone, preclude summary judgment for the defendants.

But if the Court were to conclude otherwise, then Plaintiffs are entitled to discovery as to the actual, programmatic purpose of IO 52 and the extent, if any, to which IO 52 *in fact* serves the purposes advanced by the City as justifications for its suspicionless searches. As the Supreme Court explained in *Edmond*, a person who is subject to such a search or seizure is entitled to challenge the government's stated rationale for the search by launching "an inquiry into purpose at the programmatic level." 531 U.S. at 46. Although we believe that IO 52 is unconstitutional even if the City's stated rationales were the true purposes of the Interim Order, plaintiffs are entitled, at a minimum, to discovery of "evidence to determine the primary purpose of the * * *

---

[2]   The City did not file a Rule 56.1 Statement to accompany its summary judgment motion. That failure alone is grounds for denial of the motion. Local Civil Rule 56.1(a).

14

program." *Ibid*. If for no other reason, the City's summary judgment motion should be denied because plaintiffs have not yet had an opportunity to conduct such discovery. See Pl. Rule 56.1 Statement.

## CONCLUSION

For the foregoing reasons, and those stated in our motion papers, Plaintiff's motion to enjoin the enforcement of IO 52 should be granted, and the City's motion to dismiss, or in the alternative for summary judgment, should be denied.

Respectfully submitted,

| OF COUNSEL: | LAW OFFICES OF THOMAS P. PUCCIO |
|---|---|
| Michael T. Murray<br>Office of the General Counsel of<br>the Patrolmen's Benevolent<br>Association of the City<br>of New York<br>40 Fulton St.<br>New York, New York 10038-1850<br>Telephone: (212) 775-4500 | Thomas P. Puccio<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 883-6383<br>Fax: (212) 883-6388<br><br>ROBBINS, RUSSELL, ENGLERT, ORSECK,<br>UNTEREINER & SAUBER LLP<br><br>By: /s/ *Lawrence S. Robbins*<br>Lawrence S. Robbins (LR-8917)<br>Donald J. Russell<br>Alison C. Barnes<br>Brian A. Pérez-Daple<br>1801 K Street, N.W.<br>Suite 411<br>Washington, D.C. 20006<br>Tel: (202) 775-4500<br>Fax: (202) 775-4510<br><br>C*ounsel for Plaintiffs* |

Dated: November 16, 2007